# EXHIBIT A

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Consolidated Matters of: | |
| PARENT ON BEHALF OF STUDENT, | OAH CASE NO. 2010020941 |
| v. | |
| RAVENSWOOD CITY SCHOOL DISTRICT, | |
| RAVENSWOOD CITY SCHOOL DISTRICT, | OAH CASE NO. 2010040340 |
| v. | |
| PARENT ON BEHALF OF STUDENT. | |

## DECISION

Administrative Law Judge Rebecca P. Freie, Office of Administrative Hearings, State of California (OAH), heard this matter in East Palo Alto, California, on May 17-20, 24-27, June 3-4, and 7-9, 2010.[1]

Eugene Whitlock, Attorney at Law, appeared on behalf of the Ravenswood City School District (District). Present for portions of the hearing as District representatives were Linda Lee, Director of Special Education for the District, and Kathleen Thompson, Special Education Coordinator for the District. A District representative was present throughout the hearing.

Elizabeth Aaronson, and Alexis Casillas, Attorneys at Law, appeared on behalf of Student. Student's father (Father) was present for part of the first day of hearing. Student's

---

[1]Testimony concluded on June 8, 2010. On June 9, 2010, a telephonic hearing was conducted, exhibits were formally admitted into evidence, and a briefing schedule was set for closing arguments and Student's Motion for Sanctions. A separate order will be issued regarding the Motion for Sanctions.

mother (Mother) was present for the first two weeks of hearing, and present for portions of the remaining days of hearing.[2]

On the first day of hearing, Kathleen Humphrey, Attorney at Law, appeared on behalf of Steven Hansen, M.D., and Palo Alto Medical Foundation (PAMF). Ms. Humphrey presented motions to quash and objections to a subpoena duces tecum issued to PAMF, and a subpoena requesting the personal appearance of Dr. Hansen issued by the District several days prior to the commencement of the hearing. The motions to quash and objections were ruled upon after brief testimony and argument the first day of hearing, and are addressed in a separate order. Student had also filed a motion to quash a subpoena the District issued for Mother's appearance, and that motion will also be addressed in the separate order.

On February 23, 2010, Student filed a Request for Due Process Hearing (complaint). On March 4, 2010, OAH granted a joint request for a continuance. On April 5, 2010, the District filed its own complaint, and on April 9, 2010, Student filed a motion to consolidate the complaints which OAH granted on April 15, 2010. On May 5, 2010, the District filed an amended complaint. On June 9, 2010, following the conclusion of testimony, the matter was continued to July 19, 2010, to permit the parties to submit written closing arguments. Upon receipt of the closing arguments on July 19, 2010, the record was closed, and the matter was submitted.[3]

## PRELIMINARY MATTERS

### *District's Delayed Request for Admission of Evidence*

During the teleconference of June 9, 2010, the ALJ asked the District's attorney to submit calendars for the 2007-2008 school year, and the 2008-2009 school year. Student did not object to this request. On June 16, 2010, the District submitted this evidence. The calendar for the 2007-2008 school year is admitted as Exhibit D-55. The calendar for the 2008-2009 school year is admitted as Exhibit D-56. The District also submitted an individualized educational program (IEP) pertaining to Student dated June 3, 2005, and asked that it be admitted to establish that Mother was provided with a notice of procedural safeguards on that date. The District claimed that this document was necessary evidence in relation to Student's request that the two-year statute of limitations for the filing of a complaint be waived. Student did not object to the admission of this document.

The ALJ will not admit this document into evidence because it is untimely and irrelevant. In regards to timeliness, the document was in one or both parties' evidence

---

[2] Mother and Father are collectively referred to as "Parents."

[3] Student's closing argument has been designated as Exhibit S-86 for identification, and the District's closing argument has been designated D-57 for identification.

binders, but was not identified during the hearing, or introduced into evidence. On the last day of hearing, at the conclusion of testimony, the ALJ allowed the parties to stipulate to documents each wished to have admitted into evidence. After each party had submitted a stipulated list of exhibits for which admission was requested, the ALJ, Ms. Casillas, and Ms. Thompson (with the express authorization of Mr. Whitlock) examined the evidence binders and ensured that each admitted exhibit was appropriately identified and marked as admitted in the official evidence binders, and documents that were not admitted were removed from the binders. One exhibit was not admitted but left in the evidence binder because Student had not asked for or received agreement from the District's attorney that it be admitted, so admittance was considered to be disputed.

During the teleconference on June 9, 2010, the ALJ read into the record the list of documents the parties had agreed to have admitted. Argument was heard concerning the one disputed exhibit, and the exhibit was then admitted over Student's objection. At no time during the June 9, 2010 hearing, did the District's attorney ask that the June 3, 2005 IEP be admitted. Therefore, his request of June 16, 2010, is untimely.

The proffered exhibit is also irrelevant. During the hearing, there were several instances of oral argument concerning the waiver of the statute of limitations. The District argued that there was no need to provide a notice of procedural safeguards when a request for assessment was made in 2007 because Parents had been given a notice of procedural safeguards in 2005, when the District declined to find Student eligible for special education following an assessment as shown by the June 2005 IEP. The ALJ rejected this argument because the 2007 request for assessment was found to be one for an initial assessment, since Student was not made eligible for special education at the IEP meeting in 2005. The District did not renew this argument in its closing brief.

*Exhibits Attached to Student's Closing Argument*

During the telephonic conference of June 9, 2010, the ALJ set a page limit for written closing arguments. Student's attorney asked if that precluded attachments to the closing argument. The ALJ assumed that Student was referring to the practice of attaching a table of contents, a table of authorities, or copies of pertinent cases, as is required by some State and federal courts. Student's closing argument contained a table of contents and a list of witnesses. Student also attached the following exhibits to his closing argument:

    A.    A current vision report from Student's physician;

    B.    An email dated May 27, 2010, from District's attorney to Student's attorneys;

    C.    A declaration previously submitted by the District's attorney as part of another pleading;

D.     A PowerPoint presentation from a training presented by the California Department of Education;

E.     A chart created by Student's attorneys showing his progress on goals created on September 11, 2008;

F.     A chart created by Student's attorneys showing his progress on goals created on September 11, 2009; and

G.     An email to one of Student's attorneys from Stellar Academy dated July 16, 2010, documenting Student's progress in a program he began this summer.

The District has asked that the exhibits attached to Student's closing argument be stricken as they were not authorized by the ALJ during the hearing of June 9, 2010.  The exhibits are stricken because they were not authorized by the ALJ.  In addition, they are stricken as hereafter noted.  Exhibits A and D are stricken as they could have been introduced as evidence during the hearing, but were not, and therefore are untimely.  Exhibits B and C are stricken as they are already part of the record.  Exhibits E and F are stricken as inadmissible hearsay.  Also, Exhibits E and F represent an attempt by Student's counsel to extend their closing brief beyond the page limit for those briefs imposed on the parties by the ALJ on June 9, 2010.  Exhibit G is stricken as an untimely attempt to introduce new evidence, and as irrelevant to the matters at issue in this case.

*District's Notice of New Authority*

On July 26, 2010, the District submitted a request that the ALJ take notice of "new authority," *Lathrop R-II School District v. William Gray* (8th Cir., July 2, 2010, No 09-3428, WL 2630337).  On July 27, 2010, Student filed a response to this request.  Student contended that the ALJ should disregard this new case because the opinion was issued before the District's closing argument was due, and therefore should have been cited in his closing argument, and further because it is not authoritative precedent.

Members of the California State Bar have an ethical duty not to mislead a judge or judicial officer.  (Rules Prof. Conduct, rule 5-200(B).)  If an attorney discovers new case law after submitting a brief, and the attorney believes this new case law is pertinent to his case, failure to advise the judicial officer of this new law could be construed as misleading the judicial officer.  Therefore, Student's argument that this case should be disregarded because its submission was untimely is rejected.  However, Student is correct that because this case was heard in the Eighth Circuit, it is not binding on this tribunal.  California is part of the Ninth Circuit.  The ALJ may consider decisions from other Circuits, although they are not binding authority.  The case will be given the weight it deserves, if any.

4

ISSUES[4]

*Student's Issues*

1.      Should the statute of limitations in this matter be extended to include claims prior to February 22, 2008, in respect to some of the issues, due to either 1) specific misrepresentations of the District which prevented Parents from requesting a due process hearing; or 2) the withholding of information by the District from Parents that was required to be provided to them under special education law?

2.      Did the District deny Student a free appropriate public education (FAPE) by failing to meet its child find obligations from March 21, 2007, up to and including the 2007-2008 school year? [5]

3.      Did the District deny Student a FAPE because Parents were denied meaningful participation in the individualized educational program (IEP) process from March 21, 2007, through the end of the 2007-2008 school year because the District failed to provide them with prior written notice of:

        a.      The District's refusal to evaluate Student at Parents' request; and

        b.      The District's refusal to provide Student with appropriate services and instruction as required to meet his needs resulting from a specific learning disability?

4.      Did the District deny Student a FAPE because the May 29, 2008 psychoeducational assessment of Student was not conducted in a timely manner?[6]

5.      Did the District deny Student a FAPE because the IEP meeting of September 11, 2008, was not conducted in a timely manner?

6.      Did the May 29, 2008 psychoeducational assessment conducted by the District meet legal requirements?

---

[4] The issues have been reworded and reordered for clarity from the Order by ALJ Stella Owens-Murrell issued after the Prehearing Conference (PHC) on May 10, 2010. The matter of extending the statute of limitations has been added as an issue by the ALJ.

[5] At the hearing, the ALJ preliminarily ruled, subject to further argument in closing briefs, that the statute of limitations would be extended to March 21, 2007, so that date is stated in relation to some of the issues in this portion of the Decision.

[6] At the beginning of the hearing, the counsel for the District and the counsel for Student stipulated that this issue and the following issue were resolved by mutual agreement, with the District stipulating that it did not timely conduct the May 29, 2008 psychological assessment, nor did it hold the September 11, 2008 IEP meeting timely. However, during the course of the hearing, the District attempted to withdraw this stipulation, so, in an abundance of caution, both issues will be addressed.

7. Was Student denied a FAPE because his parents were denied meaningful participation in the IEP process by the District committing procedural violations during the 2009-2010 school year by:

      a. Failing to provide them with the Notice of Parent Rights and Procedural Safeguards; and

      b. Failing to respond to Parents' request for information concerning Student's disability?

8. Did the District deny Student a FAPE during the 2008-2009 school year because:

      a. The District failed to provide meaningful present levels of performance (PLOPs) in the IEP of September 11, 2008;

      b. The District failed to provide appropriate goals in the IEP of September 11, 2008;

      c. The District failed to offer an appropriate program and services in the IEP of September 11, 2008; and

      d. The District failed to implement the IEP as offered?

9. Was Student denied a FAPE because his parents were denied meaningful participation in the IEP process by the District committing procedural violations during the 2009-2010 school year by:

      a. Failing to provide a specific offer of placement and/or placement options;

      b. Failing to provide them with the Notice of Parent Rights and Procedural Safeguards; and

      c. Failing to respond to Parents' request for information concerning Student's disability?

10. Did the District deny Student a FAPE during the 2009-2010 school year because:

      a. The District failed to provide meaningful present levels of performance (PLOPs) in the IEP of February 3, 2010;

b.      The District failed to provide appropriate goals in the IEP of February 3, 2010;

c.      The District failed to offer an appropriate program and services in the IEP of February 3, 2010; and

d.      The District failed to implement the IEP as offered?

*District's Issue*

11.     Did the District's offer of services and placement in the IEP of February 3, 2010, offer Student a FAPE?[7]

## CONTENTIONS

Student claims that the statute of limitations should be extended back to the 2006-2007 school year, although he does not give a specific date to which the statute should be extended. Student contends that the District failed provide Parents with a notice of procedural safeguards in the spring of 2007 when Mother asked that he be assessed for special education services. As a result, the statute of limitations should be extended beyond the two years prior to the filing of the complaint in this matter. Student further claims that the District made a misrepresentation on April 4, 2007, that prevented him from filing a complaint. Student also contends that the District did not comply with statutory timelines in assessing him and holding the initial IEP meeting following the assessment, and this denied him a FAPE. In addition, he contends that during the period of time between the request for assessment and the initial IEP meeting in September 2008, the District failed to comply with its child find obligations. Student argues that he was denied a FAPE for the 2007-2008 school year as a result of the delay in assessing him. Student further contends that the District's psychoeducational assessment was inadequate and inappropriate. Student claims that the District denied him a FAPE for both the 2008-2009 and 2009-2010 school years because it failed to state accurate PLOPs in the IEP. In addition, he claims that he was not given appropriate goals for both school years. Student also contends that the District did not offer him appropriate placement and services for those years. Further, Student alleges that the District failed to implement both IEPs for the 2008-2009 and 2009-2010 school years. He also contends that he was denied a FAPE because the District's procedural violations denied Parents meaningful participation in the IEP process both years. He is requesting three years of compensatory education.

The District contends that it complied with all procedural requirements at all times. It argues that when it refused to assess Student in the spring of 2007, it was within its rights to

---

[7] The parties argued additional matters in their closing briefs that are not listed as issues in the order following the PHC, and those issues will not be addressed in this decision.

do so because Parents failed to provide the District with results of medical vision and hearing testing the District had asked them to procure for Student, and it could not assess him until it had those results. The District also argues that this failure of Parents to present these testing results excuses its delay in assessing Student. The District supports the appropriateness and adequacy of its psychoeducational assessment, and contends that its IEPs for both the 2008-2009 and 2009-2010 school years were appropriate. The District claims that the only reason Student did not make the progress he could have made with the IEPs was because Mother refused to address his attention deficit disorder (ADD), which caused him to lose focus in class, and act out behaviorally. Further, the District argues, Mother's failure to send him to extended school year (ESY) classes during the summer of 2009 impeded his educational progress. The District contends that its offer of placement in a general education classroom using the Inside Language and Literature reading program (Inside Program) for struggling readers would have provided Student with a FAPE for the 2009-2010 school year.

FACTUAL FINDINGS

*Jurisdiction*

1.       Student has resided with Mother within the boundaries of the District most, if not all, of his life. His is now 11 years of age. He has attended Edison-Brentwood Academy (Brentwood) since the beginning of his kindergarten year, the 2004-2005 school year. He repeated the first grade after being retained.

2.       Brentwood is a charter school of the District. However, the District provides special education assessment and services to Brentwood students who are eligible. An IEP team found Student eligible for special education on September 11, 2008, under the category of specific learning disability.

3.       The evidence established that Student lacks phonemic awareness, which affects his ability to associate written letters with the sounds they make. When shown letters of the alphabet, he cannot discriminate, interpret, memorize and produce sounds properly in conjunction with those letters. Student has difficulty writing words, even when he is copying them. Although he was just completing fourth grade at the time of the hearing, the evidence established that Student was only able to read kindergarten-level books, and could only add and subtract single-digit numbers with ease.

*Statute of Limitations*

4.       A party initiating a request for a due process hearing must file that request within two years from the date the party initiating the request knew, or had reason to know, of the facts underlying the basis for the request. This time, limitation does not apply to a parent if the parent was prevented from requesting the due process hearing due to either: 1) Specific misrepresentations by the local educational agency that it had solved the problem

8

forming the basis of the due process hearing request; or 2) The withholding of information by the local educational agency from the parent that was required to be provided to the parent under special education law.

5.      Special education law requires a school district to provide a notice of procedural safeguards to parents when they request a special education assessment for their child, or the child is referred for a special education assessment. In addition, if an assessment is requested by parents, and the district refuses to assess the child, it must provide parents with prior written notice explaining its reasons for not assessing the child. The withholding of this information may constitute grounds for extending the statute of limitations.

6.      Student contends that the statute of limitations should be extended beyond two years prior to the date on which he filed his complaint, February 23, 2010. Student argues that the District misrepresented to Mother that it could not assess him in the spring of 2007 because it did not have the results of medical vision and hearing testing. Further, Student contends that the District withheld the notice of procedural safeguards, when Mother asked that he be assessed on March 21, 2007.

7.      Student repeated the first grade in the 2006-2007 school year. His teacher was Zina Crews. Mother frequently talked to Ms. Crews about the difficulty Student was experiencing in her class, even though he was repeating the first grade. In February 2007, a Student Success Team (SST) meeting was convened to address Mother's concerns. The District's SST process involved the convening of a meeting with parents and school personnel to determine if interventions were needed to help a struggling student, and to create a plan to implement suggested interventions. SST meetings had been convened in previous school years concerning Student.

8.      The evidence established that at the meeting of February 5, 2007, the team decided that Mother would obtain medical hearing and vision tests because Student had previously failed screenings in these areas by the school nurse. On March 21, 2007, the SST reconvened. Mother asked that Student be referred for a special education assessment, and all members of the team agreed.

9.      The District was required to give Mother a notice of procedural safeguards at the March 21, 2007 SST meeting, when she requested, and the team agreed, that Student be referred for a special education assessment. It was not District policy to provide this notice at SST meetings, even if a parent requested a special education assessment, or the team recommended such an assessment. The failure to provide the notice of procedural safeguards to Mother on March 21, 2007, was a withholding of information from a parent that the District was legally obligated to give.

10.     The District's method of developing special education assessment plans for students when a request for initial assessment was made was to hold a meeting with a parent,

9

the integrated services teacher (IST), and those specialists who would most likely be assessing the student for special education.[8] The participants in this meeting were called the Initial Assessment Team (IAT). The meeting would be convened within two weeks after the request or referral for assessment was made. The assessment plan would then be developed by the IAT, and signed by the parent at this meeting.

11.     On April 4, 2007, the IAT meeting was held concerning Student. Participating in the meeting were Mother; a Brentwood IST, Catherine Mendoza; Ms. Crews, Student's teacher; and a speech and language therapist assigned to Brentwood at that time. Ms. Mendoza testified that it was likely that District personnel had already determined prior to the April 4, 2007 IAT meeting, that the IAT would not develop an assessment plan for Student at this meeting.

12.     At the IAT meeting of April 4, 2007, Mother was told that Student could not be assessed until she provided the District with the results of the medical vision and hearing tests she had been asked to procure at the SST meeting of February 5, 2007. This led Mother to believe that until she provided the District with the medical hearing and vision results, the District could legally refuse to assess him, and this was a misrepresentation of the law. This misrepresentation by the District misled Mother into believing that the District had valid, legal reasons for refusing to assess Student, and she did not have grounds to contest the District's refusal to assess. There is no legal authority to support the District's contention that Student could not be assessed for special education because the District did not have medical vision and hearing test results for Student.[9]

13.     Mother presented as an involved and caring parent who made ongoing attempts to obtain assistance from the District so Student could be helped, both before and after he was found eligible for special education. She was responsive to teacher calls concerning Student's behavior in class, and came to school several times a year to observe him in class. She participated in numerous meetings with school personnel, both before and

---

[8] Most school districts use the term, Resource Specialist Program (RSP) teachers to refer to special education teachers who provide services to children who are placed in general education classes with typically developing students. The District refers to RSP teachers as ISTs.

[9] Counsel for the District argues that Student should not be permitted to argue statute of limitations issues related to the District's refusal to assess Student because it did not have medical vision and hearing test results, because the issue was not raised in his complaint, the order following the PHC or a prehearing brief concerning the issue. This is disingenuous because the existence of documentary evidence related to this issue was only discovered after the hearing had begun, after the District's attorney asked personnel at the Brentwood school site to conduct an exhaustive search for records pertaining to Student. Most of the records discovered during the search were not provided to Student as part of his records requests pursuant to Education Code section 56504 in the weeks and months prior to hearing. In addition, the existence of these records was not known by either of the District representatives, or the District's attorney until they were discovered during the course of the hearing.

after March 21, 2007, some formal, and others more informal.  She believed what she was told by District personnel.[10]

14.    Although Mother testified that she was not provided with the prior written notice of the District's refusal to assess Student on April 4, 2007, and she was not provided with the notice of procedural safeguards at this meeting, the evidence did not establish this. It was clear when Mother testified that she lacks specific recollection or understanding of what occurred at most of the meetings she has attended with school personnel concerning Student over the many years preceding the hearing.

15.    The District introduced as evidence a copy of the prior written notice it provided to Mother at the April 4, 2007 IAT meeting concerning its refusal to assess Student, and Mother's signature is on that notice.  This form is from the Special Education Local Plan Area (SELPA) to which the District belongs.  It indicates that if the District refuses to assess, "Parental Rights" will be attached to the prior written notice.  The evidence established that Mother was provided with the prior written notice, and the notice of procedural safeguards at the April 4, 2007 IAT meeting.

16.    The District did not provide Mother with the notice of procedural safeguards on March 21, 2007, although it did provide them to her on April 4, 2007.  The District represented to Mother on April 4, 2007, that it could refuse to assess Student if she did not provide the District with the results of the medical vision and hearing testing.  This is a misrepresentation that prevented Mother from requesting a due process hearing because she was led to believe that the District had legal grounds for refusing to assess Student at that time.  Accordingly, the two-year time limit for filing a claim is not applicable in this case, and this Decision shall make findings dating back to March 21, 2007, including the 2007-2008 school year.

*Child Find*

17.    Under the Individuals with Disabilities Education Act (IDEA) and California law, a school district has an affirmative, continuing obligation to identify, locate, and evaluate all children with disabilities residing within its boundaries.

18.    Student contends that the District had a child find obligation concerning Student after it refused to assess him in April 2007.  Student's point is well taken.  Even if the District was waiting for Mother to provide the vision and hearing test results, if Student was struggling that school year, the District had a duty to initiate an evaluation.  However, there was no specific evidence concerning Student's classroom performance or academic struggles he may have had during the 2007-2008 school year.

---

[10] The term, "District personnel" includes employees of Brentwood, notwithstanding the District's attempts during the hearing to differentiate between employees of the charter school, and employees of the District.

19.     Diahanna Flores, Brentwood's SST coordinator, testified that she continued to request vision and hearing test results from Mother at the latter part of the 2006-2007 school year, as well as the beginning of the 2007-2008 school year, which indicates that the need for Student to be assessed was still on the District's radar.  Marta Grau-Batelle, school psychologist at Brentwood for part of the 2007-2008 school year also testified.  In addition, Diane Witwer, Principal at Brentwood during this school year, also testified.  None of these witnesses provided specific information that Student was still struggling to such a degree during the 2007-2008 school year, that the District was put on notice that he needed to be assessed immediately.  Accordingly, the evidence did not establish that the District failed to meet its child find obligation from March 21, 2007, to the end of the 2007-2008 school year.

*Prior Written Notice*

20.     A school district must provide written notice to the parents of a pupil whenever the district refuses to initiate or change, the identification, evaluation, or educational placement of the pupil, or the provision of a FAPE to the pupil.  The notice must contain: 1) a description of the action refused by the agency; 2) an explanation for the refusal, along with a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the refusal; 3) a statement that the parents of a disabled child are entitled to procedural safeguards, with the means by which the parents can obtain a copy of those procedural safeguards; 4) sources of assistance for parents to contact; 5) a description of other options that the IEP team considered, with the reasons those options were rejected; and 6) a description of the factors relevant to the agency's refusal.

21.     Failure to provide parents with prior written notice is a procedural violation.  A procedural violation constitutes a denial of FAPE only if the violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; or (3) caused a deprivation of educational benefits.

22.     Student contends that he was denied a FAPE because Parents were deprived of meaningful participation in the IEP process from March 21, 2007, through the end of the 2007-2008 school year, due to the District's failure to provide them with prior written notice of its refusal to evaluate Student.  Student then argues, in his closing brief, that the prior written notice of April 4, 2007, was inadequate, and this denied Parents meaningful participation in the IEP process.  Finally, he argues that the District should have provided Mother with prior written notice each time she inquired about the District's delay in assessing Student after April 4, 2007, and during the 2007-2008 school year.

23.     As determined in Factual Findings 14 and 15, on April 4, 2007, the District did provide Parents with prior written notice of its refusal to assess Student for special education following Mother's request for assessment on March 21, 2007.  Inquiries about a delay in assessing a child are not requests for the child to be assessed.  There was no evidence that Mother made additional requests for Student to be assessed after April 4, 2007, through the end of the 2007-2008 school year.

12

24.     The prior written notice of April 4, 2007, contains blanks for District personnel to state: 1) the documents reviewed by district staff to determine whether the referral was appropriate; 2) a description of the action proposed by the agency; 3) a "reason for the district's proposed action[;]" 4) other options considered by the district; and 5) "[o]ther factors believed to be relevant to the district's recommendation."

25.     This prior written notice states that the reason the District was refusing to conduct the assessment was because it was "[waiting] for the vision and hearing test results from the doctor and the district nurse (re-evaluation). Parent will furnish a copy of the doctor's note on 4/5/07." The blanks following items 4) and 5) were not completed on the form. In his closing brief, Student argues that this prior written notice was inadequate because items were left blank. However, Student failed to establish that the incomplete prior written notice denied Parents meaningful participation in the IEP process.

26.     Student contends that the District should have provided Parents with prior written notice concerning its refusal to provide Student with appropriate services and instruction for a student with a specific learning disability, from March 21, 2007, through the end of the 2007-2008 school year. Until Student was determined eligible for special education at an IEP meeting, the District was under no obligation to provide Student with appropriate services to address Student's special needs resulting from his specific learning disability. Accordingly, the District had no obligation to provide Parents with prior written notice of a refusal to provide Student with appropriate services and instruction to address his needs as resulting from his specific learning disability from March 21, 2007, through the end of the 2007-2008 school year.

*Timeliness of Assessment and Subsequent IEP Meeting*[11]

27.     An IEP meeting must be held within 60 days of receiving parental consent to the assessment plan, exclusive of school vacations in excess of five school days and other specified days. When a school district fails to meet the statutory timelines for assessing a student and holding an IEP meeting, it is a procedural violation.

28.     Although she requested that Student be assessed for special education on March 21, 2007, Mother was not given an assessment plan to sign until an IAT meeting held on December 17, 2007, nearly nine months, after her request and the SST referral for assessment.[12] Student was assessed for academic achievement in March 2008, but was not

---

[11]  At the commencement of the hearing, the parties stated that the District was stipulating that it did not conduct its psychoeducational assessment of Student in a timely manner, following the March 21, 2007 request for assessment, and it did not timely convene the subsequent IEP meeting. However, during the course of the hearing, the District filed a motion to withdraw this stipulation. The motion was denied. However, in abundance of caution, the issues will be addressed briefly.

[12] District acknowledged that it had the results of Student's medical vision testing at the IAT meeting of December 17, 2007, although it was not clear when the District received these results.

assessed by a school psychologist until May 2008, and the report of the psychoeducational assessment was then issued on May 29, 2008. The IEP meeting was not held until September 11, 2008. September 11, 2008, was almost 18 months after the assessment request of March 21, 2007.[13]

29.     The District contends that it could not assess Student until Mother provided the vision and hearing test results to the District and argues that the 15-day and 60-day time limits were tolled until Mother provided those results to the District. However, the District did not cite any legal authority to support that contention, nor was any legal authority found.

30.     As a result of the District's delay in creating an assessment plan, assessing Student, and holding an IEP meeting, Student received no special education services for the 2007-2008 school year. Based on the results of the psychoeducational assessment conducted in May 2008, the testimony of witnesses, as well as documentary evidence, the evidence established that Student would have been found eligible for special education at either the end of the 2006-2007 school year, or the beginning of the 2007-2008 school year had he been timely assessed, and an IEP would have been developed so he could receive meaningful educational benefit that school year. This procedural violation resulted in Student loosing educational opportunity and being denied a FAPE for the 2007-2008 school year.

*Adequacy of the District's Psychoeducational Assessment Dated May 29, 2008*

31.     A school district's assessments shall be conducted by trained and knowledgeable personnel. In conducting an assessment, a district must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student. No single measure or assessment shall be used as the sole criterion for determining whether a student is a child with a disability or for determining an appropriate educational program for the student. Tests and assessment materials must be validated for the specific purpose for which they are used; must be selected and administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's native language or other mode of communication unless this is clearly not feasible. In California, school districts may not administer tests that measure a student's intellectual quotient (IQ) if a student is African American. Other measures must be used to measure the cognitive abilities of an African American student.[14]

---

[13] Student and the District both argue that this issue of timeliness also applies to the speech and language assessment, which was part of the December 17, 2007 assessment plan. This evaluation was not conducted until November 3, 2008, and the timeliness of this evaluation concerning this evaluation was not held until December 10, 2008. However, the timeliness of this evaluation and subsequent IEP meeting was not designated as an issue in the Order following the PHC, and was not raised as an issue at the due process hearing. Therefore, it will not be addressed.

[14] *Larry P. v. Riles* (N.D. Cal. 1979) 495 F.Supp.926, affd. in pt., revd. in pt., *Larry P. v. Riles* (9th Cir. 1986) 793 F.2d 969.

14

32.     It was undisputed that the District had a severe shortage of school
psychologists in 2007 and 2008, which resulted in delays in conducting psychoeducational
assessments of the District's students.  Towards the end of the 2007-2008 school year, the
District contracted with San Francisco Unified School District (SFUSD) to have several
school psychologists from that district assess the District's students who needed
psychoeducational assessments.

33.     Dena Edwy McManis, an employee of SFUSD, conducted a
psychoeducational assessment of Student in May 2008.  Ms. McManis has an undergraduate
degree in psychology, a master's degree in forensic psychology, a master's degree in school
psychology, and a master's degree in education.  She is currently enrolled in a doctor of
psychology (Psy.D.) program in educational psychology.  Ms. McManis is a credentialed
school psychologist, and was so in May 2008.  She is also a nationally certified school
psychologist.  The 2009-2010 school year was her fourth year at SFUSD as a school
psychologist.  Ms. McManis has completed approximately 250 psychoeducational
assessments and related reports.

34.     As part of her assessment, Ms. McManis reviewed school records and
interviewed Student, Student's teacher and Mother for the assessment.  She reviewed the
results of the Woodcock-Johnson Test of Achievement, Third Edition (WJ-III) that an IST at
Brentwood had conducted in March 2007 to measure Student's academic achievement.
Because Student is African American, she could not administer an IQ test to determine his
cognitive abilities.  Instead, she administered the NEPSY-II to Student which is a
neuropsychological assessment tool.[15]  She also administered to Student the Wide Range
Assessment of Memory and Learning, Second Edition (WRAML-2), the Comprehensive
Test of Phonological Processing (CTOPP), the Beery-Buketenica Developmental Test of
Visual-Motor Integration, Fifth Edition (VMI), and the student version of the Behavior
Assessment Scales for Children, Second Edition (BASC-2).  In addition, Ms. McManis
interviewed Mother for the Vineland Adaptive Behavior Scales, Second Edition (Vineland-
II).  Mother, Student and his teacher completed the questionnaires for the BASC-2.  The
evidence established that all of these instruments were validated and not culturally biased.
Ms. McManis administered them correctly.  There was no evidence that this testing did not
meet the statutory criteria for assessments.

35.     Based on the results of her testing, Ms. McManis determined that Student was
cognitively impaired, and this was why he was having difficulty in school.  Based on this
conclusion, Ms. McManis made recommendations for providing Student with special
education services.

36.     At the IEP meeting of September 11, 2008, the IEP team determined that
Student was eligible for special education under the category of "specific learning

---

[15] NEPSY is not an acronym.

disability," not mental retardation.[16] The evidence established that the team reached this conclusion because all of the team members acquainted with Student did not believe he was cognitively impaired. Further, the results of the psychoeducational assessment also supported a finding that Student had a specific learning disability, especially in light of the extremely low scores Student received on the CTOPP, and subtests of the NEPSY.

37. In November and December 2009, Kimberly Noll, a credentialed school psychologist conducted an independent psychoeducational assessment of Student. Because it was an independent assessment, Ms. Noll administered the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV), an IQ test.[17] Ms. Noll determined that Student has a full-scale IQ of 87, in the low-average to average range, and is not cognitively impaired. Therefore, Student contends that the assessment by Ms. McManis was inadequate. However, as previously noted in Factual Finding 34, there was no credible evidence that Ms. McManis failed to comply with the legal requirements imposed on psychoeducational assessments. The fact that most witnesses, both Student's and several of District witnesses, disagreed with her opinion that Student was mildly cognitively impaired did not invalidate the results of her testing. Ms. McManis's results were not that much different than those of Ms. Noll's. It was just the interpretation of those results that differed.

*The IEP of September 11, 2008[18]*

*Procedural Violations*

38. Student contends he was denied a FAPE because Parents were not provided with the notice of parent rights and procedural safeguards, and the District failed to provide them with information they requested concerning Student's disabilities. As a result, they were denied meaningful participation in the IEP meeting of September 11, 2008.

39. The evidence established that Mother and Father were both given the notice of parent rights and procedural safeguards at the IEP meeting. Father requested his own notice after one was given to Mother. Several witnesses who attended that IEP meeting testified to this, and the IEP documents from this meeting affirmed this testimony. Student argues in his closing brief that the District had an obligation to explain those procedural safeguards to Mother in a way that she could understand them. However, there was no evidence that Mother asked for an explanation, or indicated that she did not understand them.

---

[16] The eligibility category for students with cognitive impairment is mental retardation under the IDEA.

[17] *Student v. New Haven Unified School District* (2007), Cal. Ofc. Admin. Hrngs., Case No. 2007070362 .

[18] Student and the District also discuss the adequacy of the IEP of December 10, 2008, which was related to Student's speech and language assessment. However, this was not designated as an issue in the Order following the PHC, and therefore, will not be addressed.

40.     The evidence did not establish that the District failed to respond to parental requests for information concerning Student's disability during the 2008-2009 school year, thereby denying parents meaningful participation in the IEP process.[19]  Witnesses testified that both Mother and Father asked questions at the IEP meeting on September 11, 2008, and the questions were answered.  There was no evidence that the District denied Parents meaningful participation in the meeting by failing to respond to their questions about Student's disability.

41.     Mother wrote a letter to the District in January 2009, and the District did not respond to this letter with another.  However, Mother did not ask for information concerning Student's disability in this letter, but rather questioned the length of time the District had taken to assess Student, and asked that he be provided with a method of instruction to address his disability.  Therefore, any failure to respond to this letter did not establish that the District did not respond to questions asking for more information about Student's disability.

*Provision of a FAPE for the 2008-2009 School Year* [20]

42.     To provide a FAPE, an IEP must meet the student's needs, and be reasonably calculated to confer a meaningful educational benefit.  The IDEA does not require a school district to provide the best education to a child with a disability, or an education that maximizes the child's potential.

43.     An IEP is evaluated in light of information available at the time it was developed, and is not to be evaluated in hindsight.  When an IEP team creates an IEP, it looks at the unique needs of the child, creates goals to be achieved over the next 12 months, basing those goals on the child's PLOPs, and then determines what services the student needs, and what educational placement will best meet those needs.

44.     Parents consented to the IEP on September 11, 2008.

45.     The educational assessment portion of the May 29, 2008 evaluation showed that Student's academic scores were consistently at a preschool or kindergarten level.  At the time of this assessment, Student had attended Brentwood as a regular student in general education classrooms for nearly four years.  Student's performance on the assessments conducted by Ms. McManis, particularly on subtests in the CTOPP, WRAML-2 and NEPSY-II, showed that Student had "significant difficulty retrieving phonological

---

[19] In his closing brief, Student argues that Parent asked for information concerning "her educational rights" in this letter, and contends that the District's failure to explain them pertains to this issue.  However, Mother asked for information about "No Child Left Behind," which is not a request for information about Student's disability, or a request for an explanation of the notice of procedural safeguards.

[20] The evidence established that Student's specific learning disability and educational needs have not changed during the time period covered in this decision.  Therefore, the description of Student's specific learning disability and educational needs in this section of the decision also pertain to the 2009-2010 school year.

information from long-term memory and executing a sequence of operations quickly and repeatedly." According to Ms. McManis, "These abilities have a direct affect [sic] on reading fluency." The assessment also indicated that Student might have some attention issues.

*District's Failure to Provide Meaningful PLOPs*

46.     For each area in which a special education student has an identified need, the IEP team must develop measurable annual goals that are based upon the child's present levels of academic achievement and functional performance, and which the child has a reasonable chance of attaining within a year. These goals are determined by the student's PLOPs. Student contends that the District did not provide meaningful levels of Student's performance when it formulated goals for the IEP of September 11, 2008, and this resulted in him being denied a FAPE.

47.     Student was assigned to the caseload of Bernard Mojares, an IST at Brentwood, prior to the IEP meeting of September 11, 2008. Mr. Mojares received a teaching credential in special education in the Philippines in 2001, and taught special education in that country. He began working for the District in November 2007, and has a California preliminary special education credential. Mr. Mojares testified that he observed Student in class two or more times prior to formulating goals for the September 11, 2008 IEP meeting, and also informally screened Student to determine his PLOPs so he could create proposed goals prior to that meeting.

48.     Mr. Mojares utilized a screening tool called the SteDell to determine Student's PLOPs. The SteDell is a screening tool that teachers can use to determine which California grade-level standards a student has met. Teachers complete a form for a specific grade level, each section indicating what knowledge a student should have at that grade level in a particular academic area.

49.     Goals for the IEP are written on standardized forms that contain a section for the student's baseline performance in that area to be stated. The baseline levels may also reflect a student's PLOP in that area. In each of the academic goals created by Mr. Mojares for the IEP, Student's baseline was stated as "0% on SteDell." However, there was no indication as to which grade level SteDell tool was used, or what that specific tool measures. Therefore, these PLOPs were meaningless, even to educators familiar with the SteDell. The evidence established that Student was functioning at a kindergarten or pre-kindergarten grade level in all academic areas for which goals were created. Given the fact that the baselines were so vague, it would be impossible to measure the progress Student made on each goal as the school year progressed.

50.     The IEP document also contained a page that was titled, "Present Levels of Academic Achievement and Functional Performance." This page states that "[Student]'s performance is low in broad reading and written language. He has the ability to add and

subtract, but struggles with most Math concepts." This language understates the findings of Student's academic levels that were established when he was given the WJ-III six months earlier. The IST performing the assessment stated in her report, "When compared to others at his age level, [Student]'s performance is very low in broad reading , math calculation skills, written language and written expression." In assessing his math skills she wrote, "His overall mathematics ability is negligible; math tasks above the age 5-11 [five years, 11 months] level will be quite difficult for him." Describing his broad reading abilities she wrote, "His overall reading ability is negligible[.]" The evidence established that the District did not provide meaningful levels of Student's current performance in the IEP when it formulated academic goals for him.

*Adequacy of Goals[21]*

51.    For each area in which a special education student has an identified need, the IEP team must develop measurable annual goals that are based upon the child's present levels of academic achievement and functional performance. The purpose of goals and measurable objectives is to permit the IEP team to determine whether the pupil is making progress in an area of need.

52.    Mr. Mojares created four academic goals for Student in the areas of spelling, reading, and mathematics for the September 11, 2008 IEP. Although writing was identified in the psychoeducational assessment of May 29, 2008, as an area of need, Student was not given any writing goals.

53.    One of Student's reading goals was to identify upper- and lower-case letters of the alphabet. Progress was to be measured by the percentage of letters he was able to identify, but there was no mechanism to determine what letters Student could identify when the school year began, and what letters he was expected to identify at the end of the school year. It appears that Student was required to name the exact letter of the alphabet shown to him. However, if Student was to learn how to read, he needed to know the sound or sounds each letter represented, rather than just being able to name the letters of the alphabet when shown to him. This goal did not meet Student's needs in the area of reading.

54.    Another reading goal was to respond to ask and answer questions when a story was read out loud to him. In her psychoeducational evaluation, Ms. McManis emphasized that Student was a "Visual/Nonverbal Learner" who "learns best when information is presented visually and in a picture or design format." The evidence established that in order to learn how to read, Student needed to develop phonemic awareness, then the ability to

---

[21] Student had three speech and language goals that were developed in November 2008. Although lacking PLOPs, these goals appear to otherwise be adequate, and there was no evidence that they were not, so only the academic goals are addressed here.

decode words through phonics. This goal does not address Student's needs in the area of reading. In addition, the objectives were not sufficiently clear to determine what kind of progress Student was expected to make each reporting period. Student was expected to ask and answer an increasing percentage of questions each reporting period, but there was no information as to what questions he was expected to ask or answer. Again, this goal did not meet Student's needs in the area of reading.

55.     Student's spelling goal was to determine a "reasonable" phonetic spelling of 10 to 15 words. The words he was to spell were not identified, and again, progress was measured by the percentage of words Student was able to spell, with the percentage of progress expected to increase each reporting period. If the words Student was to spell were words composed of letters he knew the sounds of, and the words were identified, this might be a reasonable reading goal. However, as written, the goal was too vague to determine what area of need it addressed, and the objectives for each reporting period were also too vague to be meaningful.

56.     Ms. McManis recommended that Student be taught functional math skills such as measurement and counting money in her psychoeducational evaluation of May 2008. Student's mathematics goal was to be able to add and subtract numbers up to 20 with 80 percent accuracy. For the first progress reporting period, Student was to add numbers up to 10 with 40 percent accuracy. For the second progress reporting period, Student was to subtract numbers up to 15 with 60 percent accuracy. For the final reporting period, Student was to achieve the goal of adding and subtracting numbers up to 20 with 80 percent accuracy. The type of progress Student was to make each reporting period had no relationship to the progress he was supposed to make in the previous reporting period. The goal did not address Student's need to learn functional math skills. Also, it was impossible to determine exactly what math skills Student had when this goal was created, because the PLOPs were not provided for this goal, and the psychoeducational evaluation of May 2008 did not provide any indication of what, if any, skills Student had in the area of mathematics.

57.     Mr. Mojares testified that when he created these goals, he relied on his observations of Student in the classroom at the beginning of the school year, and the psychoeducational assessment of May 29, 2008, in which Ms. McManis opined that Student was cognitively delayed. Mr. Mojares did not believe that these goals needed to be changed when the IEP team agreed that Student was not cognitively impaired, but was suffering from one or more specific learning disabilities. There was no evidence that any of the goals Mr. Mojares had drafted for the IEP meeting were changed, modified, or added to, nor were new goals drafted at the meeting, in spite of the fact that Mr. Mojares believed Student would be found eligible for special education under the category of mental retardation when he drafted those goals. Mr. Mojares testified that his understanding was that the purpose of goals was to support a student's current level of performance. Only after being asked a leading question by the District's attorney did he acknowledge that goals were targets for improvement.

20

58.    According to Ms. Noll, measurements of a student's cognitive abilities are indicative of his ability to be successful in school. Therefore, goals developed with the belief that a child was cognitively impaired would underestimate a student's ability to progress academically during the school year, and encourage teachers and other service providers to work more slowly on these goals, and repeat lessons to ensure the student achieved them. A student who was not cognitively impaired would likely become bored, and resist instruction.

59.    The IEP and the psychoeducational evaluation of May 2008 did not provide any evidence of what Student's specific needs were in the areas of reading, writing and mathematics. One could not determine what skills Student had at the beginning of the school year from reading either the IEP, or the psychoeducational evaluation. Additionally, the objectives for each goal did not provide sufficient information for someone to determine what progress Student was making in achieving these goals. The goals were inadequate for the 2008-2009 school year.

*Offer of Placement and Services*

60.    The District prides itself as being a "full inclusion" school district. There are no special education classes in District schools. Instead, students with IEPs are integrated full-time into general education classrooms, and ISTs come into classrooms to provide intensive instruction to these students. ISTs have special education credentials. General education teachers in the classroom modify the general education curricula in the classroom with the assistance of ISTs to accommodate the needs of students with IEPs. Sometimes instructional aides work with special needs students in the classroom. If students with disabilities have special needs that will not permit them to be integrated into the District's general education classes, the District makes arrangements to place them in special day classes (SDCs) in other districts by way of an inter-district transfer, or places them in classes operated by the county office of education, or nonpublic schools.

61.    For the 2008-2009 school year, the District offered Student specialized academic instruction by an IST for 45 minutes, three times a week in a group setting in a general education classroom. The IEP called for Student to work with an "adapted" curriculum and materials, and to be given extra time to complete tasks and tests. It also called for Student to read and repeat directions, wear his glasses, and receive peer tutoring. [22]

62.    Student contends that these services and placement in a general education classroom were insufficient to address his significant deficits in reading, writing and mathematics. Mr. Mojares testified that in his opinion, 45 minutes, three times per week, was a sufficient amount of IST services for Student, especially since Student had difficulty staying on task. However, Mr. Mojares also testified that in November 2008, IST services

---

[22] Student was prescribed eyeglasses in 2007. The District argued that Student's refusal to wear his eyeglasses also contributed to his inability to access the curriculum in the classroom. However, there was no evidence that his reading difficulties were due to the fact that he would not wear his glasses.

for Student were increased to 45 minutes, five days a week, because he had made "slight progress." The District also decided to provide Student with the services of instructional aides for individualized and group work for 120 minutes, each day, primarily to support him when he was participating in the general education curriculum.

63.     Based on Student's significant deficits in the areas of reading, writing and mathematics, the evidence established that the services and placement specified in the IEP of September 11, 2008, were not designed to provide Student with a FAPE. The services Mr. Mojares provided to Student were not sufficient to address Student's needs resulting from his specific learning disability.

64.     To address Student's reading disability, Mr. Mojares provided Student with worksheets from a program called "Explode the Code" during the 2008-2009 school year. The same worksheets were provided to Student repeatedly throughout this school year and the next by Mr. Mojares, but Student was resistant to completing them. Although the District employs reading specialists, their services are only available to general education students without IEPs. The IST is responsible for developing a reading program to help a student who has an IEP.

65.     Mr. Mojares also worked with Student in the area of mathematics. However, it was not clear from his testimony what he was doing with Student when he taught him math. There was some evidence that Mr. Mojares was using a program called "Touch Math" with Student, which employs manipulatives. There were also math games on Friday. These activities were conducted during the 45 minutes Mr. Mojares spent with Student each day, usually in a small group.

66.     In November 2008, when the District began providing Student with the services of an instructional aide for two hours each day, the evidence established that the instructional aide assisted Student with completing worksheets related to the reading program the general education students were using in class, "Open Court." Student would be read the selections from the Open Court text, or he would listen to them on CDs. The instructional aide (or sometimes the classroom teacher) would then read some of the questions at the end of each selection to Student orally, and assist him in completing written and oral responses.

67.     Student was assigned to the general education third grade class taught by Autumn Buzzell until October 2008. He was then transferred to a general education class taught by Colleen Kelly Francisco. Although Ms. Lee, Director of Special Education for the District, testified that one of the IST's duties was to assist the general education classroom teachers in modifying the curriculum for students with special needs, the evidence established that both these teachers made these modifications without the assistance of Mr. Mojares who testified that he did not have time to assist general education teachers in doing this.

22

68.     The evidence established that both Ms. Buzzell and Ms. Francisco were diligent and creative in modifying the general education curriculum so that Student could access it.  There was no evidence that Student struggled in science, which consisted of "hands-on" experiments, or social studies, which also consisted of hands-on activities, and other activities involving classroom participation.  There was no evidence that Student struggled in physical education, music or art, although he might exhibit resistance to participating in some of these activities.

69.     Student's experts disagreed with the District's IEP services and placement recommendations.  Ms. McManis established in her evaluation, especially with the CTOPP, that Student had severe issues in the area of phonological awareness.  Ms. Noll recommended that Student receive three to four hours per day of intensive intervention in all academic areas that would address his needs as a student with dyslexia.  Ms. Noll's detailed recommendations included reading instruction using a program such as the Slingerland or Orton Gillingham Approach, and the use of other programs and strategies such as counseling to address his stress and depression that are the result of his inability to progress academically.  Ms. Noll recommended that Student would benefit from a small-group placement with intensive reading instruction in a small group where he would be able to master the skills he needs to learn to read.  The evidence established that Ms. Noll's psychoeducational evaluation was an accurate picture of Student's educational needs at the beginning of the 2008-2009 school year although it was completed over one year later.  Although Ms. Noll's recommendations were not available to the IEP team in September 2009, the evidence established that they reflect the type of placement and services Student required at the time the IEP of September 11, 2008, was drafted, for Student's needs to be met, and for him to be provided with a FAPE.  Ms. Noll's recommendations were supported by Ms. McManis's findings that Student had difficulties with phonological awareness and memory.

70.     Ms. Noll has been a school psychologist in California since 1996.  She has a clear California pupil personnel services credential in school psychology, and is also a licensed educational psychologist.  She is currently employed by the Santa Clara Unified School District as a school psychologist, and is also employed one day per week as a licensed educational psychologist by The Center for Developing Minds, a private assessment center.  She has conducted an average of 100 psychoeducational evaluations each of the last 12 years.  Ms. Noll was a very persuasive witness.  Her independent assessment of Student conducted in November and December 2009 was detailed and thorough.

71.     Student engaged in frequent disruptive and off-task behaviors in class.  These behaviors included refusals to do work with his instructional aide; refusals to do the work given to him by the IST, instructional aides and his classroom teacher; and shouting at all of them.  At times, he became tearful and cowered under his desk when tearful.  Student had difficulty maintaining focus for more than a few minutes at a time, and was impulsive and impatient.

72.     District contends that Student has ADD, and this causes him to act out behaviorally. The District claims that Student's disruptive behavior and inability to maintain focus when he is given academic work in class is one of the reasons Student has not progressed educationally. The District contends that Mother should have had him assessed for medication. However, Student has not been medically diagnosed with ADD. Although Student's pediatrician has given her a referral for this assessment, Mother was exploring other options at the time of the hearing.

73.     Also testifying on behalf of Student was Margaret Galloway. Ms. Galloway is a professional educational therapist with a master of science degree in special education. She does not have a current clear multiple subject teaching credential in California, although she has had one in the past. She privately tutors students, and has been doing so since 1998. She has specialized training in teaching reading, and has completed specialized training in the Slingerland and Orton Gillingham methods of teaching reading, as well as certain Lindamood Bell reading programs. Although Ms. Galloway had not met Student or assessed him, she reviewed the September 11, 2008 IEP, as well as the psychoeducational evaluations by Ms. McManis and Ms. Noll. Ms. Galloway recommended that Student be provided with a reading program that is explicit, systematic, and intensive, with repetition and simultaneously kinesthetic and multi-sensory instruction. Reading programs that are like this include the Slingerland and Orton Gillingham methods of teaching reading, as well as certain Lindamood Bell reading programs. Ms. Galloway testified that Student could learn how to read with such a program, even though he has ADD. She was a very persuasive witness, and her testimony was accorded great weight.

74.     As established in Factual Findings 71 and 72, Student had outbursts throughout the 2008-2009 school year that the District attributed to ADD. Nevertheless, the testimony of Ms. Noll and other witnesses did not support the District's contention that all of these behaviors are the result of Student's ADD. The evidence also established that Student experienced a high level of frustration in the classroom which was related to the inadequacy of classroom instruction.

75.     The evidence established that the services offered by Mr. Mojares were not effective in addressing Student's needs in the areas of reading and math. There was no evidence that the District utilized a program and provided services to Student that specifically addressed his needs in the areas of reading, writing and math. In addition, although Ms. Lee testified that the District had "reading specialists" who went into classrooms to assist "struggling readers," their services were only available for the general education student, not for students with IEPs. Students with IEPs were assisted in reading by ISTs, all of whom have special education credentials. However, the evidence established that Mr. Mojares did not provide Student with specialized instruction that met his needs.

76.     When a student exhibits serious behavior problems in the school setting that impedes his ability to make educational progress, a behavior support plan (BSP) may be created to eliminate the behavior. A BSP describes the targeted behaviors, describes the

24

environment in which the behaviors occur and the events preceding the behaviors. A strategy is developed to either prevent the targeted behavior, or to control it if it cannot be prevented using positive reinforcement.

77.    In an effort to deal with Student's behavioral issues, the District utilized the services of Karen Yoshioka, a behavioral specialist employed by the county office of education. In the spring of 2009, several meetings were held involving Mother, Ms. Yoshioka, Mr. Mojares and Ms. Francisco, as well as others who worked with Student. A behavioral support plan (BSP) was created for Student to address his behaviors, and it was revised before the end of the 2008-2009 school year.[23]

78.    Student required a BSP that would address his verbal outbursts, and his inability to stay on task and focus in the instructional setting. It was then important that the BSP be consistently implemented, and revised if it was not effective in addressing Student's maladaptive behaviors. Although Student's BSP was revised several times, and there was some improvement in Student's behavior when the BSP began to be used in the classroom, the evidence did not establish that the BSP was consistently implemented by classroom staff, or that there was a marked improvement in Student's behavior as a result of the BSP.

79.    If a BSP does not address a student's behavioral issues, a school district can conduct a functional analysis assessment (FAA) which is an in-depth evaluation of a child's behavior throughout the school day, and it then can develop a behavior intervention plan (BIP) to address the behavioral issues. A BIP is more detailed and specific than a BSP. The District never asked Parents if it could conduct an FAA and develop a BIP once it realized that the BSP was not effective in modifying Student's behaviors that impeded his ability to make academic progress in the classroom.

80.    The evidence established that the placement and services in the IEP of September 11, 2008, and the behavioral services, did not meet Student's needs and denied him a FAPE for the 2008-2009 school year.

*Failure to Implement the IEP*

81.    A failure to implement a Student's IEP will constitute a violation of the Student's right to a FAPE if the failure was material, and Student was denied a FAPE as the result of the failure to implement the IEP.

82.    The evidence established that the District implemented the IEP as described in Factual Findings 61 and 62. The District provided Student with the specialized instructional services of Mr. Mojares for 45 minutes, three days a week, and then increased Mr. Mojares's time with Student to 45 minutes, five days a week. In addition, the District added 120

---

[23] Although the BSP was not part of the September 11, 2008 IEP, it was developed to assist school personnel in providing the services and specialized instruction called for in the IEP.

minutes a day of services to Student from an instructional aide to provide him with additional specialized instruction, and to assist him in accessing the general education curriculum. Ms. Buzzell and Ms. Francisco provided Student with the accommodations called for in the IEP. In addition, because Student's behaviors impeded his ability to learn, the District provided him with a BSP.

83.     Student was not denied a FAPE because the District failed to implement the IEP. Rather, Student was denied a FAPE because the IEP, even when implemented, did not meet his needs.

84.     The evidence established that Student did not make meaningful educational progress during the 2008-2009 school year. Although one of his reading goals was to recognize upper- and lower-case letters, Student's teacher for the 2009-2010 school year credibly testified that at the end of the following school year, Student still could not consistently recognize letters of the alphabet, or identify the sounds associated with them. In addition, at the end of the 2009-2010 school year, Student was still only able to add and subtract single-digit numbers. The IEP did not provide Student with an appropriate program and services, did not provide adequate levels of performance when academic goals were created, and the team did not create meaningful goals at the IEP meeting of September 11, 2008.

*The 2009-2010 School Year[24]*

*Procedural Violations*

85.     Student contends that the District denied him a FAPE during the 2009-2010 school year by failing to make a specific offer of placement, failing to provide his parents with the notice of procedural safeguards at IEP meetings, and failing to respond to Parents' questions about Student's disabilities, which denied them meaningful participation in the IEP process.

86.     The IEP team initially met on September 11, 2009. Mother attended this IEP meeting, and was joined during the meeting by an advocate. The meeting lasted for more than four-and-one-half hours. When the meeting ended, the team was discussing placement of Student for the 2009-2010 school year.

87.     The District team members discussed the possibility of placing Student at a school other than Brentwood. Several other elementary schools in the District were piloting a new reading program for struggling readers, the Inside Program, and District team members suggested that Mother visit one or more of the classrooms in the District that were offering the program. During the meeting, there was also discussion about the possibility of

---

[24] Speech and language services were also addressed in the IEP for this school year, but are not addressed here because this was not an issue in the Order following the PHC.

placing Student in a SDC operated by another school district or the county office of education, as well as the possibility of tutoring at a Sylvan Learning Center after school. However, the IEP team had not reached the point where the District could make an offer of placement. Due to the lateness of the hour when the meeting ended, there was no agreement as to when the meeting would reconvene. The evidence did not establish that the District had an obligation to make a clear offer of placement at the September 11, 2009 IEP meeting, because the meeting ended before the team had finished discussing potential placements. The District offered to show Mother proposed District placements, but did not offer to show her any out-of-District alternative placements.

88.     There was evidence that Mother did observe at least two classrooms in the District using the Inside Program, but it was unclear when she visited and whether she observed any other classrooms outside the District. Mother subsequently retained legal counsel, and the IEP team did not meet again until February 3, 2010.

89.     At the IEP meeting of February 3, 2010, there was discussion about the possibility of Student receiving six hours a day of reading instruction at a Lindamood Bell Learning Center, which Student's attorney suggested. The District team members discussed placing Student at another District school in a classroom using "an intervention program," which was the Inside Program. The testimony at hearing established that the District did make a clear offer to place Student in a general education classroom using an Inside Program.

90.     The evidence established that Mother was given the notice of procedural safeguards at the IEP meetings of September 11, 2009, and February 3, 2010. The IDEA requires school districts to provide parents with the notice of procedural safeguards only once per year, and the District did so.

91.     At the IEP meeting of September 11, 2009, Mother had questions about Student's academic abilities. Therefore, the District offered to have Mr. Mojares conduct an educational assessment so her questions could be answered. However, as was the District's usual practice, there were no assessment plan forms available at the meeting.

92.     Mr. Mojares testified that he created an assessment plan and sent the form home to obtain Mother's consent on at least two occasions in September or October 2009, but he did not keep copies of the forms. Mother did not return a signed assessment plan to him. The evidence established that the District did not take further action to assess Student, so it could respond to Mother's questions. However, the District subsequently paid for the independent assessment by Ms. Noll that included the administration of the Wechsler Individual Achievement Test, Third Edition, an assessment tool that measured Student's academic achievement. Therefore, the evidence established that the District responded to Mother's request for more information about Student's disability. She had this information at the IEP meeting of February 3, 2010, so Student failed to prove that the District did not

provide Parents with information about Student's disability, thus denying her meaningful participation in the meeting.

*PLOPs*

93.    Included as part of the evidence is a form entitled "Present Levels of Academic Achievement and Functional Performance," which contains information from an informal screening of Student that Mr. Mojares conducted on September 9, 2009. This information, combined with progress reports related to the previous year's goals, was presented at the IEP meeting on September 11, 2009. This version of information concerning Student's PLOPs was inadequate because the skill levels for Student are not explained in a way that would enable someone to determine what goals would need to be formulated to address his unique needs. In addition, some of the information contained in this form simply cannot be true.[25]

94.    At some point prior to the February 3, 2010 IEP meeting, this form was modified and improved; the information provided was much more detailed and explicit. In addition, the goals contained in the IEP were rewritten to reflect baselines that were much more detailed and understandable than baselines on the goals presented at the September 11, 2009 IEP meeting.

95.    On February 3, 2010, the IEP team also reviewed Ms. Noll's detailed and thorough psychoeducational assessment, as well as a report from a Lindamood Bell Center. The evidence established that the IEP had sufficient information concerning Student's PLOPs to create meaningful goals.

*Goals*

96.    Mr. Mojares presented goals at the September 11, 2009 IEP meeting that were inadequate in that they were created without access to accurate and meaningful information, with baselines that did not clearly portray Student's level of performance at the beginning of the school year. Further, some of the goals did not contain objectives that would allow one to measure Student's progress in achieving the goal.

97.    As with the PLOPs, the goals were modified after the September 11, 2009 IEP meeting, and additional goals were created. The evidence established that the goals presented at the IEP meeting on February 3, 2010, addressed some of Student's needs, and contained measurable objectives. Student was not denied a FAPE because these goals were inadequate.

---

[25] For example, the form states that Student can "find the sum or difference of two whole numbers up to three digits long. . . 66.67% [of the time]," but Ms. Hem testified that at the end of this school year, Student was still only able to add and subtract single-digit numbers.

*District's Offer of Program and Services*

98.     At the IEP meeting of September 11, 2009, the District offered Student the services of an IST for 45 minutes, five days a week, and 180 minutes each day of instructional aide services. The classroom accommodations for Student were expanded in 2009 from those in the IEP of September 11, 2008, as discussed in Factual Findings 61 and 82. Added to the list of accommodations, modifications and support were "highlight text or key words, use of manipulatives, [p]icture/visual aids, reduce visual distractions, provide clear view of the chalkboard, [and] give directions in few steps."

99.     At the IEP meeting of February 3, 2010, the District offered IST services for 45 minutes each day, five days a week, 240 minutes each day of instructional aide services, and placement in a general education classroom using the Inside Program. The only classroom at Student's then fourth-grade level using the Inside Program was at Green Oaks School. Mother observed this classroom after the February 3, 2010 IEP meeting and did not agree to have Student placed in this classroom and provided with the Inside Program. The District also offered Student IST services for 45 minutes each day, 240 minutes each day of instructional aide services, and two 30-minute speech and language therapy sessions in a group setting. In addition, an updated BSP was added to the IEP.

100.     Mother rejected the District's proposed placement, although she consented to the increased classroom services of the ISTs and instructional aides. The evidence established that the Inside Program was too advanced for Student, as is discussed in Factual Findings 106 through 111, below.

101.     As previously discussed in Factual Findings 69 and 73, Student requires a small-group placement with intensive reading instruction in a small group where he would be able to master the skills he needs to learn to read. Student needs a reading program that is explicit, systematic, and intensive, with repetition and simultaneously kinesthetic and multi-sensory instruction. Placement in a general education classroom was not appropriate, even with the services of an IST and instructional aides, and accommodations and modifications to the general education curriculum as provided by the general education teacher.

102.     Testimony by Sarah Hem, Student's general education teacher for the 2009-2010 school year established that she imaginatively modified the general education curriculum, including the classroom's fourth-grade level Open Court reading program, which permitted Student to listen to someone reading a selection out loud, and then responding to questions at the end of the selection that were read out loud to him by either a instructional aide, or the teacher. However, this was not the type of reading instruction described in Factual Findings 69 and 73, and would not provide him with a FAPE. Although this participation in the Open Court program helped develop Student's critical thinking skills, it did not help him learn to read.

103.   During the 2009-2010 school year, the District also utilized educational computer software with Student, which Ms. Noll recommended in her report.  The evidence established that Student enjoyed working on the computer, but it was unclear whether some of the software merely allowed Student to practice skills he already had, or taught him new skills.  In addition, the District's BSP for the 2009-2010 school year rewarded Student with 10 minutes of computer time at the end of the day when he was compliant, so it was unclear whether Student's opportunities to work with educational software on the computer were related to his educational program, or merely part of the BSP.

104.   One educational software program that assisted Student's academic performance was the CoWriter software program that predicts words as Student types them on the computer with approximate spellings.  One of Student's goals for the school year was to learn how to produce written sentences with this program.  The evidence established that the use of this program provided Student with educational benefit.  However, there was no evidence that the use of other computer software was a planned strategy to help Student learn.  Rather, it appeared that the software was made available to Student so he could practice skills he already knew.

105.   Student had a BSP for the 2009-2010 school year that was expected to modify his off-task behaviors, his outbursts to adults, and his resistance to working on classroom tasks.  However, the evidence did not establish that the BSP was effective, since Student's maladaptive behaviors did not significantly decrease during the school year, except for a few weeks in the spring of 2010.[26]

*Inside Program*

106.   Several District witnesses testified enthusiastically about the effectiveness of the Inside Program in improving the reading skills of "struggling" readers.  However, the teacher of the Green Oaks class using the Inside program, Charles Roberson, testified that the program was much less effective with his students who were reading at less than second-grade level.  The evidence established that, at the time of the hearing, Student was still reading at a kindergarten level.

107.   Student's lack of phonemic awareness must be addressed before he can move on to other reading levels.  The Inside Program addresses phonemic awareness briefly at the beginning of each lesson, but does not do so in a way that will assist Student in developing it.  The program moves too rapidly for Student to be able to access it.  The presence of an IST in the classroom part of the time to assist Student, and several hours per day of instructional aide assistance will not remedy the shortcomings of the District's proposed placement of Student in a classroom using the Inside Program.

---

[26] The District argued in its closing brief that the BSPs for both school years were ineffective because Mother did not implement them at home as required.  However, there was no evidence that Mother was required to implement the BSPs at home.

108.    The evidence established that Student is aware that he does not have the same abilities to read, write, and do math as others in his class. He responds by protesting that he cannot do work that he has done before, shouting at other students and adults in the classroom, crying, and refusing to work. The evidence did not establish the District's contention that the ADD was the cause of his inability to read. Placement in a class using the Inside Program will not resolve any of these issues, and may exacerbate them.

109.    Ms. Galloway persuasively opined that the Inside Program would not effectively address Student's needs resulting from his specific learning disability in reading. The Inside Program used in Mr. Roberson's class begins with lessons addressed to students reading at a second-grade level or above. Student still reads at the kindergarten level.

110.    The evidence established that Student's specific reading disability is extremely rare, and very hard to remedy. However, Ms. Galloway, Ms. Noll, and Judy Taber, Director of Stellar Academy, a small private school specializing in the education of students with reading disabilities, all testified credibly that Student's needs could be effectively addressed by programs such as Slingerland, Orton Gillingham, other similar programs, or certain Lindamood Bell programs, and Student could learn to read with proper instruction. These programs all provide intensive, explicit, multi-sensory and scaffolded reading instruction. Some school districts have implemented these programs to enable students with reading disabilities to learn how to read, but the District only has the Open Court reading curriculum for students who are not struggling readers, and the Inside Program that is used in a general education class that is composed of struggling readers. These programs do not meet Student's needs. Student requires a program that will teach him phonemic awareness, such as one of those recommended by his experts. Only then can he be taught phonics, and then move on to learning to read fluently, developing vocabulary, and being able to read with comprehension.

111.    For these reasons, and for the reasons discussed in Factual Findings 60 through 80, pertaining to the 2008-2009 school year, the District's offer of placement and services for the 2009-2010 school year would not provide Student with meaningful educational benefit and a FAPE.

*Implementation of the IEP*

112.    Mother consented to the services offered in the IEP of February 3, 2010. The evidence established that the IEP was fully implemented in regards to these services. However, as in the 2008-2009 school year, the IEP as written and implemented did not meet Student's needs, and provide him with meaningful educational benefit and a FAPE.

*Reimbursement*

113.    Parents may be entitled to reimbursement for the costs of services they have procured for their child when: 1) the school district has failed to provide a FAPE and 2) the

private placement or services are determined to be proper under the IDEA. The parents may receive reimbursement so long as their placement met the student's unique needs and provided the student with educational benefit.

114.    There was no evidence that Parents procured services from private providers prior to the date the complaint was filed that would require an order for reimbursement. In addition, no invoices, statements, receipts or other documents evidencing a need for reimbursement were introduced into evidence. Accordingly, reimbursement is not being ordered.

*Compensatory Education*

115.    School districts may be ordered to provide compensatory education or additional services to a pupil who has been denied a free appropriate public education. The conduct of both parties must be reviewed and considered to determine whether relief is appropriate. These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place."

116.    As established by Factual Findings 27 through 30, the District's delay in assessing Student and holding an initial IEP meeting denied him a FAPE for the 2007-2008 school year, because he was not provided with an IEP and special education services and a program that would meet his unique needs.

117.    As established by Factual Findings 60 through 80, the program and services in the IEP for 2008-2009 did not address Student's needs that resulted from his specific learning disability, and thus he was denied a FAPE that school year. The evidence established that Student could not consistently identify all of the letters of the alphabet when Mr. Mojares screened him at the beginning of the 2008-2009 school year, and he could not do simple math calculations, as his single math goal was to add and subtract numbers up to 20 for that school year. Ms. Hem testified persuasively, and her testimony was supported by the results of Ms. Noll's evaluation, that at the end of the 2009-2010 school year Student still could not consistently match letters of the alphabet with their sounds, and he was reading at a kindergarten level. The evidence clearly established that Student did not gain meaningful educational benefit from the placement and services provided to him by the District for the 2008-2009 school year, because his needs were not met, and this denied him a FAPE.

118.    As established by Factual Findings 93 through 105, the program and services provided to and offered to Student in the IEP of February 3, 2010, also did not address Student's needs that resulted from his specific learning disability. As with the 2008-2009 school year, the evidence clearly established that Student did not gain meaningful

educational benefit from the placement and services provided to him by the District for the 2009-2010 school year, and this denied him a FAPE. The evidence also established that the District's proposed placement in a general education classroom for the 2009-2010 school year also would not have met his needs, and thus denied him a FAPE.

119.    As previously discussed, the District failed to provide or offer Student a FAPE for the 2007-2008, 2008-2009 and 2009-2010 school years. Student has serious academic deficits as the result of the District's failure to provide him appropriate services and placement to address his needs that are a result of his specific learning disability. He therefore requires intensive compensatory education for at least the next three school years.

120.    The District has argued that Student did not benefit from the programs and services it offered because Student has ADD which interfered with his ability to focus and access the curriculum, and Mother refused to address that issue by having him assessed for medication. Further, Mother did not enroll him in ESY in the summer of 2009, and this caused him to regress. These arguments are without merit. Although Student may have attention issues that affect his ability to focus and stay on task in the classroom, the evidence did not establish that he has ADD. Rather, the evidence established that the District's special education services were inadequate in addressing his learning disability, and Student's resulting frustration exacerbated his behavior. Further, there is no legal authority for limiting compensatory services because a parent refuses to medicate a child with ADD. In addition, the evidence established that although the District created a BSP to address Student's behavioral issues, it was not effective in resolving those issues. The District's argument that the BSP was not effective because Mother did not implement it with Student in the home is also without merit. Finally, the evidence did not establish that Student regressed educationally in the summer of 2009 because he was not enrolled in ESY.

121.    Ms. Taber, Director of Stellar Academy, described the program at this very small private school that educates students with severe reading disabilities. Stellar has 25 students who are split into two classrooms. During the 2009-2010, one classroom had students between ages of nine and 13, and the other had students between the ages of 12 and 14. Teachers are assisted by one or more aides in each classroom. The Slingerland method is used to teach reading and language arts. Students are taught according to State grade-level standards. If a student requires speech and language therapy, a speech pathologist can be brought into the school from a private agency to provide the service to a student during the school day or it can be provided before or after school.

122.    A typical school day begins at 8:15 a.m., and language arts is taught from 8:30 a.m. to 11:00 a.m., with one recess. In the afternoon, there is oral language practice and 30 minutes of read-aloud time. The remainder of the school day is devoted to math, science, social studies or history, American Sign Language instruction, physical education, and choir. Computers are embedded in each classroom. In Ms. Taber's opinion, a student who is as far behind as Student will need one to two hours of tutoring each school day, part of which might be done during the school day, for example, during language arts time, or before or

after school.  Ms. Taber believes that Student will benefit from two to four years of instruction at Stellar.

123.    The program at Stellar Academy contains most, if not all of the elements Ms. Noll and Ms. Galloway recommended as an effective means of meeting Student's needs that have resulted from his specific learning disability, and the District's failure to provide him with an appropriate program and services for three years.

124.    Ms. Taber met Student and testified persuasively that he still has the desire to learn, and if he has ADD, the school will still work with him.  In addition, she reviewed at least one of Student's BSPs, and believes that these behaviors will not occur as frequently, if at all, at Stellar, and if they do, teachers and staff can appropriately address them.

125.    The evidence established that Stellar Academy has a program and reading curriculum that will address Student's specific learning disability in that area, and curriculum and teaching methods that will also address his deficits in mathematics and writing.  Based on all of the evidence, appropriate compensatory education for Student would be three years of attendance, beginning with the 2010-2011 school year, and continuing through the 2011-2012 and 2012-2013 school years.

126.    In addition, the evidence established that Student's deficits are so great that he will also acquire 600 hours of compensatory education in the form of tutoring and other special programs during his three years of attendance at Stellar.  This amount of compensatory education comports with Ms. Taber's recommendation that Student receive one to two hours of tutoring each school day.  This compensatory education may take the form of individual tutoring by qualified specialists in the areas of reading and mathematics disabilities during or after school, and a summer program such as one that is offered by Stellar Academy.  The District shall also provide Student with transportation to and from Stellar Academy and compensatory education service providers.

LEGAL CONCLUSIONS

*Burden of Proof*

1.    Under *Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528], the party who files the request for due process has the burden of persuasion at the due process hearing.  Both parties filed requests for due process in this matter, and each has the burden of persuasion as to the issues in that party's complaint.

*Elements of a FAPE*

2.    Under both the federal IDEA and State law, students with disabilities have the right to a FAPE.  (20 U.S.C. § 1400; Ed. Code, § 56000.)  A FAPE means special education

and related services that are available to the student at no charge to the parent or guardian, that meet the state educational standards, and conform to the student's IEP. (20 U.S.C. § 1401(9).) A child with a disability has the right to a FAPE under the IDEA and California law. (20 U.S.C. § 1412(a)(1)(A); Ed. Code, § 56000.)

3.      In *Board of Educ. v. Rowley* (1982) 458 U.S. 176 [73 L.Ed.2d 690] (*Rowley*), the Supreme Court held that the IDEA does not require school districts to provide special education students the best education available, or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* at p. 198.) School districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefit to the student. (*Id.* at p. 201; *J.L. v. Mercer Island School Dist.* (9th Cir. 2010) 592 F.3d. 938, 950-953.) The Ninth Circuit has also referred to the educational benefit standard as "meaningful educational benefit." (*N.B. v. Hellgate Elementary School Dist.* (9th Cir. 2007) 541 F.3d 1202, 1212-1213; *Adams v. State of Oregon* (9th Cir. 1999) 195 F.2d 1141, 1149 (*Adams*).)

4.      There are two parts to the legal analysis of a school district's compliance with the IDEA. First, the tribunal must determine whether the district has complied with the procedures set forth in the IDEA. (*Rowley, supra,* 458 U.S. at pp. 206-207.) Second, the tribunal must decide whether the IEP developed through those procedures was designed to meet the child's unique needs, and was reasonably calculated to enable the child to receive educational benefit. (*Ibid.*)

5.      In *Rowley*, the Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA. (*Rowley, supra,* 458 U.S. at pp. 205-06.) However, a procedural error does not automatically require a finding that a FAPE was denied. A procedural violation results in a denial of FAPE only if it impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the parents' child, or causes a deprivation of educational benefits. (20 U.S.C. § 1415(f)(3)(E)(ii); see, *W.G. v. Board of Trustees of Target Range School Dist. No. 23 (Target Range)* (9th Cir. 1992) 960 F.2d 1479, 1484.)

*Statute of Limitations*

6.      A request for a due process hearing "shall be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request." (Ed. Code, § 56505, sub. (l).) This time, limitation does not apply to a parent if the parent was prevented from requesting the due process hearing due to either: 1) Specific misrepresentations by the local educational agency that it had solved the problem forming the basis of the due process hearing request; or 2) The withholding of information by the local educational agency from the parent that was required to be provided to the parent under special education law. (*Ibid.*, see 20 U.S.C. § 1415(f)(3)(D).)

*Notice of Procedural Safeguards*

7.      After July 1, 2005, the IDEA provided that a notice of procedural safeguards must be given by a school district to a particular parent of a child with a disability a minimum of once a year and/or: 1) upon initial referral for assessment or parent request for assessment; 2) upon filing a request for a due process hearing; or 3) upon parent request. (20 U.S.C. § 1415(d)(1)(A); 34 C.F.R. § 300.504(a) (2006).)

8.      There is no provision in either State or federal law that district personnel explain the notice of procedural safeguards to a parent in the absence of an affirmative request by the parent.

*Prior Written Notice*

9.      A school district must provide written notice to the parents of a pupil whenever the district proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the pupil, or the provision of a FAPE to the pupil. (20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503(a)(2006); Ed. Code, § 56500.4, subd. (a).) The notice must contain: 1) a description of the action refused by the agency; 2) an explanation for the refusal, along with a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the refusal; 3) a statement that the parents of a disabled child are entitled to procedural safeguards, with the means by which the parents can obtain a copy of those procedural safeguards; 4) sources of assistance for parents to contact; 5) a description of other options that the IEP team considered, with the reasons those options were rejected; and 6) a description of the factors relevant to the agency's refusal. (20 U.S.C. § 1415(c)(1); 34 C.F.R. § 300.503(b)(2006); Ed. Code, § 56500.4, subd. (b).) A district's failure to provide adequate prior written notice is a procedural violation of the IDEA.

*Student's Issue 1: Should the statute of limitations in this matter be extended to include claims prior to February 22, 2008, in respect to some of the issues, due to either 1) specific misrepresentations of the District which prevented Parents from requesting a due process hearing; or 2) the withholding of information by the District from Parents that was required to be provided to them under special education law?*

10.     Based on Legal Conclusions 6 through 9, and Factual Findings 4 through 16, the evidence established that the statute of limitations should be extended in this case and Student was permitted to present claims dating back to March 21, 2007. The District failed to give Mother the notice of procedural rights when she requested that Student be assessed on March 21, 2007. Further, on April 4, 2007, the District misrepresented special education law when it refused to assess Student. The District told Mother that it was refusing to assess Student because Parents had not presented the District with the results of medical hearing and vision tests they had procured for Student, and it could not assess Student until these results were received by the District. There is no legal authority to refuse to assess a student

36

because a school district does not have current medical test results. Thus, mother was misled into believing that she had no legal reason to dispute the District's refusal to assess. The District's reason for refusing to assess Student was a misrepresentation of the law, which caused a delay in Mother filing a due process request. Therefore, the statute of limitations is extended to March 21, 2007.

*Child Find*

11.    Under the IDEA and California law, a school district has an affirmative, continuing obligation to identify, locate, and evaluate all children with disabilities residing within its boundaries. (20 U.S.C. § 1412(a)(3); Ed. Code, § 56300 et seq.) The duty is not dependent on any action or inaction by parents; the district must "actively and systematically seek out all individuals with exceptional needs ... who reside in the district." (Ed. Code, § 56300.) In addition, the district must develop and implement "a practical method" to locate those individuals. (Ed. Code, § 56301.)

*Student's Issue 2: Did the District deny Student a FAPE by failing to meet its child find obligations from March 21, 2007, up to and including the 2007-2008 school year?*

12.    As established by Legal Conclusion 11, and Factual Findings 17 through 19, the District met its child find obligations during the period in question. Student was referred for an assessment to determine eligibility for special education on March 21, 2007, but a psychoeducational assessment of Student was not completed until May 2008. However, no evidence was presented that Student struggled during the 2007-2008 school year to such an extent that the District should have initiated a special education evaluation. Therefore, Student did not prove that the District failed to meet its child find obligations during the time period at issue.

*Procedural Violations*

13.    Procedural violations may constitute a denial of a FAPE if they result in the loss of educational opportunity to the student or seriously infringe on the parents' opportunity to participate in the IEP process. (*Target Range, supra*, 960 F.2d 1479, 1484.) These requirements are also found in the IDEA and California Education Code, both of which provide that a procedural violation constitutes a denial of FAPE only if the violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; or (3) caused a deprivation of educational benefits. (20 U.S.C. §1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2).)

*Meaningful Participation*

14.    A school district is required to conduct, not just an IEP meeting, but also a meaningful IEP meeting. (*Target Range, supra*, 960 F.2d 1479, 1485; *Fuhrmann v. East Hanover Board of Education (Fuhrmann)* (3d Cir. 1993), 993 F.2d 1031, 1036.) A parent

has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meeting, expresses her disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools.* (6th Cir. 2003) 315 F.3d 688, 693; *Fuhrmann, supra,* 993 F.2d at p. 1036.)

*Student Issue 3: Did the District deny Student a FAPE because Parents were denied meaningful participation in the IEP process from March 21, 2007, through the end of the 2007-2008 school year because the District failed to provide them with prior written notice of:*

        a.    *The District's refusal to evaluate Student at Parents' request; and*

        b.    *The District's refusal to provide Student with appropriate services and instruction as required to meet his needs resulting from a specific learning disability?*

15.    As established by Legal Conclusions 2, 4, 5, 9 and 14, and Factual Findings 14 and 15, the evidence established that the District did provide Parents with prior written notice of its refusal to assess Student in the spring of 2007. Student did not meet the burden of proof on this issue.

16.    As established by Legal Conclusions 9, 13 and14, and Factual Finding 26, District was under no obligation to provide prior written notice to Parents because it "refused" to provide Student with appropriate educational placement and services to address his dyslexia prior to his identification as a student eligible for special education. Student was not made eligible for special education until September 11, 2008, and prior to that date, the District was obligated to provide Parents with prior written notice only if it refused to assess Student after a request for assessment was made.

*Assessment*

17.    A child must be assessed by a school district in all areas related to the suspected disability. (20 U.S.C. § 1414(A)(2), (3); 34 C.F.R. § 300.304 (c)(4); Ed. Code, § 56330(f).) A proposed assessment plan shall be developed within 15 calendar days of the referral for assessment, not counting calendar days between the pupil's regular school sessions or terms or calendar days of school vacation in excess of five school days, from the date of receipt of the referral, unless otherwise agreed upon. (Ed. Code, § 56043, subd. (a).) In the case of school vacation, the 15-day time recommences on the date that the regular schooldays reconvene. (Ed. Code § 56321, subd. (a).) An IEP meeting must be held within 60 days of receiving parental consent to the assessment plan, exclusive of school vacations in excess of five schooldays and other specified days. (Ed. Code, §§ 56043, subds. (b), (c), 56344, subd. (a).)

*Student's Issue 4: Did the District deny Student a FAPE because the May 29, 2008 psychoeducational assessment of Student was not conducted in a timely manner?*

*Student's Issue 5: Did the District deny Student a FAPE because the IEP meeting of September 11, 2008, was not conducted in a timely manner?*

18.     As established by Legal Conclusions 2 through 5 and 13 through 17, and Factual Findings 27 through 30, the District did not conduct its psychoeducational assessment of Student in a timely manner.  The District should have created an assessment plan within 15 days following the SST meeting of March 21, 2007.  Instead, the District wrongfully refused to create an assessment plan, claiming it was not obligated to do so until it received the results of medical vision and hearing testing of Student that Parents procured.  Moreover, Mother was not asked to sign an assessment plan until December 17, 2008, but the psychoeducational assessment was still not completed until May 29, 2008.  Because the evidence established that Student would have been found eligible for special education had he been assessed in the spring or fall of 2007, and then would have been provided with an IEP and services to address his needs that resulted from his specific learning disability, this procedural violation denied Student educational opportunity and denied him a FAPE for the 2007-2008 school year.

19.     As established by Legal Conclusions 2 through 5 and 13 through 17, and Factual Findings 27 through 30, the IEP meeting of September 11, 2008, was not timely held.  Mother requested assessment on March 21, 2007, and the IEP meeting should have been held within 60 days after that.  The evidence established that Student would have been found eligible for special education at a timely IEP meeting, following a timely assessment.  He would have been given an IEP for the 2007-2008 school year, and provided with services to address his needs resulting from his specific learning disability.  This procedural violation of not holding a timely IEP meeting denied Student educational opportunity and a FAPE for the 2007-2008 school year.

*Student's Issue 6: Did the May 29, 2008 psychoeducational assessment conducted by the District meet legal requirements?*

20.     A school district's assessments shall be conducted by trained and knowledgeable personnel, except that individually administered tests of intellectual or emotional functioning shall be administered by a credentialed school psychologist.  (Ed. Code, § 56320, subd. (b)(3).)  In conducting an assessment, a district must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student.  This may include information provided by the parent that may assist in determining whether the student is a child with a disability, and the content of the student's IEP, including information related to enabling the child to be involved and progress in the general education curriculum.  (34 C.F.R. § 300.304(b)(1)(i), (ii) (2006).)  No single measure or assessment shall be used as the sole criterion for determining whether a student is a child with a disability or for determining an appropriate educational program for

the student.  (34 C.F.R. § 300.304 (b)(2) (2006).)  Tests and assessment materials must be validated for the specific purpose for which they are used; must be selected and administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's native language or other mode of communication unless this is clearly not feasible.  (Ed. Code, § 56320, subd. (a); 20 U.S.C. § 1414(b)(2), (3); 34 C.F.R. § 300.304(c)(1)(i), (ii) (2006).)

21.     As established by Legal Conclusion 20 and Factual Findings 31 through 36, the psychoeducational evaluation dated May 29, 2008, met all legal requirements.  The assessors were a special education teacher, and a credentialed school psychologist.  The assessors used several assessment tools and strategies in conducting their assessments.  All test instruments were administered in Student and Mother's language, English, and there was no evidence that any of the assessment tools were discriminatory in any way, or were administered incorrectly.

*The 2008-2009 School Year*

*Student's Issue 7: Was Student denied a FAPE because his parents were denied meaningful participation in the IEP process by the District committing procedural violations during the 2009-2010 school year by:*

      *a.     Failing to provide them with the Notice of Parent Rights and Procedural Safeguards; and*

      *b.     Failing to respond to Parents' request for information concerning Student's disability?*[27]

22.     As established by Legal Conclusions 7 and 8, and Factual Findings 38 and 39, the District did provide Parents with the Notice of Parent Rights and Procedural Safeguards at the IEP meeting of September 11, 2008, and they fully participated in the IEP meeting of September 11, 2008.

23.     As established by Legal Conclusions 4, 5, 13 and 14, and Factual Findings 40 and 41, the evidence did not establish that the District failed to respond to parental requests for information concerning Student's disability during the 2008-2009 school year, thereby denying Parents meaningful participation in the IEP process.  There was no evidence that Parents' questions about Student's disability were not answered at the IEP meeting of September 11, 2008.  Further, although Mother wrote a letter to the District in January 2009, this letter did not request information concerning Student's disability.

---

[27] In his closing brief, Student frames this issue as a "failure to provide [Mother] with adequate information to understand [Student's] educational program."  This is a new issue, and as such it will not be addressed.

*IEP and Provision of a FAPE*

24.     An IEP is an educational package that must target all of a student's unique educational needs, whether academic or non-academic. (*Lenn v. Portland School Committee* (1st Cir. 1993) 998 F.2d 1083, 1089.) The term "unique educational needs" is to be broadly construed and includes the student's academic, social, emotional, communicative, physical, and vocational needs. (*Seattle Sch. Dist. No. 1 v. B.S.* (9th Cir. 1996) 82 F.3d 1493, 1500 [citing J.R. Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106].)

25.     For a school district's IEP to offer a student a substantive FAPE, the proposed program must be specially designed to address the student's unique needs, must be reasonably calculated to provide the student with some educational benefit, and must comport with the student's IEP. (20 U. S.C. § 1401(9).) To determine whether the District offered Student a FAPE, the focus is on the appropriateness of the placement offered by the District and not on the alternative preferred by the parents. (*Gregory K. v. Longview School Dist.*, *supra*, 811 F. 2d 1307, 1314.) "In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable . . . at the time the IEP was drafted." (*Adams v. State of Oregon, supra,* 195 F.3d 1141, 1149, quoting *Fuhrmann, supra*, 993 F.2d 1031, 1041.) An IEP is not judged in hindsight; its reasonableness is evaluated in light of the information available at the time it was implemented. (*JG v.Douglas County School Dist.* (9th Cir. 2008) 552 F.3d 786, 801; *Adams, supra,* at p. 1149.)

26.     In developing the IEP, the IEP team shall consider the strengths of the child, the concerns of the parents for enhancing the education of their child, the results of the initial evaluation or most recent evaluation of the child and the academic, functional and developmental needs of the child. (20 U.S.C. § 1414(d)(3)(A).) For each area in which a special education student has an identified need, the IEP team must develop measurable annual goals that are based upon the child's present levels of academic achievement and functional performance. (Ed. Code, § 56345.) The purpose of goals and measurable objectives is to permit the IEP team to determine whether the pupil is making progress in an area of need. (34 C.F.R. § 300.347(a)(2)(i)(ii); 34 C.F.R. Part 300, Appendix A, Q.1; Cal. Ed. Code, § 56345.)

*Failure to Implement the IEP*

27.     A failure to implement a Student's IEP will constitute a violation of the Student's right to a FAPE if the failure was material. There is no statutory requirement that a District must perfectly adhere to an IEP and, therefore, minor implementation failures will not be deemed a denial of FAPE. (*Van Duyn, et al. v. Baker School District 5J* (9th Cir. 2007) 481 F.3d 770, 778-780.)

41

*Student's Issue 8: Did the District deny Student a FAPE during the 2008-2009 school year because:*

      *a.*     *The District failed to offer an appropriate program and services in the IEP of September 11, 2008;*

      *b.*     *The District failed to provide meaningful PLOPs in the IEP of September 11, 2008;*

      *c.*     *The District failed to provide appropriate goals in the IEP of September 11, 2008; and*

      *d.*     *The District failed to implement the IEP as offered?*

28.    Based on Legal Conclusions 2 through 5 and 24 through 26, and Factual Findings 46 through 50, the evidence established that the District's statements of PLOPs and baselines at the IEP meeting of September 11, 2008, provided little, if any real information that would assist providers in determining Student's needs, and whether or not Student made progress on these goals during the course of the year. Mr. Mojares's use of the SteDell screening instrument might have been able to provide sufficient information to determine Student's baselines in several areas if there was a description of what Mr. Mojares found, rather than just the statement of a percentage, without relating it to what part of SteDell was used. Further, using the SteDell percentages as baselines on the goals forms in the IEP did not tell anyone exactly what Student knew, or did not know at the beginning of the 2008-2009 school year in each of the areas covered by the goals.

29.    Based on Legal Conclusions 2 through 5 and 24 through 26, and Factual Findings 51 through 59, the IEP did not contain adequate academic goals to address Student's needs. Mr. Mojares testified that he formulated the academic goals for the 2008-2009 school year based on his observations of Student in class prior to the IEP meeting of September 11, 2008, and his review of Ms. McManis's psychoeducational assessment that concluded that Student was probably cognitively impaired. There was no evidence that any of these goals were modified during the IEP meeting of September 11, 2008. The evidence established that no goal was created in the area of writing, one of Student's identified needs. Further, the goals in reading, mathematics and spelling were not designed to meet Student's needs in those areas that resulted from his specific learning disability. Also, the goals did not contain measurable objectives, and were vague. The evidence established that the goals were inadequate to meet Student's needs, and Student made very little progress in these areas during that school year. Inadequate goals caused Student to lose educational opportunity, and thus he was denied a FAPE.

30.    As established by Legal Conclusions 2 through 5 and 24 through 26, and Factual Findings 42 and 43 and 60 through 80, the District did not offer Student an appropriate program and services to address his specific learning disability. The evidence

established that Student was provided with the services of the IST, Mr. Mojares, who came into the classroom and worked with Student either individually or in a small group setting for 45 minutes a day, three days per week, and later these services were increased to five days a week. However, the services provided by Mr. Mojares did not address Student's need for intensive reading and math instruction. There was no evidence that the District utilized a program and provided services to Student that specifically addressed his needs as a child with a specific learning disability. As a result, Student lost educational opportunity and thus was denied a FAPE.

31.     Mr. Mojares testified that he would repeatedly give Student the same classwork and assignments and Student would refuse to complete them. The District contended that Student's repeated refusals to work in class were a behavioral problem related to his ADD which Mother would not address, so any instructional and program failures should be excused. This contention was not supported by the evidence. A BSP was developed in the spring of 2009, but the evidence supports a finding that this BSP was not particularly effective in addressing these behavioral issues. Based on Legal Conclusions 2 through 5 and 24 through 26, and Factual Findings60 through 80, the District did not offer Student an appropriate program and services during the 2008-2009 school year to address his academic needs, and thus he was denied a FAPE for that school year.

32.     Based on Factual Finding 27, and Legal Conclusions 81 through 84, the District implemented the IEP as offered, but the IEP was insufficient to meet Student's needs, and he was denied a FAPE for that reason. Student was not denied a FAPE because the District failed to implement the IEP. Rather, Student was denied a FAPE because the IEP, even when implemented, did not meet his needs.

*The 2009-2010 School Year*

*Student's Issue 9: Was Student denied a FAPE because his parents were denied meaningful participation in the IEP process by the District committing procedural violations during the 2009-2010 school year by:*

      *a.     Failing to provide a specific offer of placement and/or placement options;*

      *b.     Failing to provide them with the Notice of Parent Rights and Procedural Safeguards; and*

      *c.     Failing to respond to Parents' request for information concerning Student's disability?*[28]

---

[28] In his closing brief, Student changes this issue to encompass a claim that the District failed to consider Mother's request for a NPS at the September 11, 2009 IEP meeting, and another claim that the District failed to provide enough information at the February 3, 2010 IEP meeting to enable Mother to provide informed consent to the IEP. These were not issues in the Order following the PHC, and therefore will not be addressed.

33.    Legal Conclusions 4, 5, 13 and 14, and Factual Findings 85 through 89, establish that Parents were not deprived of meaningful participation in the IEP process for this school year because the District failed to provide them with a specific offer of placement and/or placement options.  The IEP meeting of September 11, 2009, ended before the District had reached the point where an offer of placement would be made.  Further, the evidence established that the IEP team did discuss programs and services, as well as placement, and the District did make an offer of placement in a general education classroom using the Inside Program with struggling readers.

34.    As established by Legal Conclusions 4, 5, 7, 8, 13 and 14, and Factual Findings 85 and 90, the evidence establish that Mother was provided with a notice of parent rights and procedural safeguards package at the IEP meetings of September 11, 2009, and February 3, 2010.  There was no evidence that she requested an explanation of the notice of procedural safeguards, nor did the District have an affirmative obligation to explain those rights to Mother absent a request to do so.

35.    Legal Conclusions 4, 5, 13 and 14, and Factual Findings 91 and 92, establish that the District did not respond to Mother's request at the September 11, 2009 IEP meeting for additional information concerning Student's disability, but this did not result in a denial of a FAPE, or prevent Mother from participating in the subsequent IEP meeting of February 3, 2010.  At the earlier meeting, the District agreed that Mr. Mojares would conduct an assessment of Student's academic abilities.  However, he did not do so.  Nevertheless, the psychoeducational assessment by Ms. Noll satisfied the request for additional information and superseded the need for the assessment by Mr. Mojares.

*Student's Issue 10: Did the District deny Student a FAPE during the 2009-2010 school year because:*

a.    *The District failed to offer an appropriate program and services in the IEP of February 3, 2010;*

b.    *The District failed to provide meaningful present levels of performance (PLOPs) in the IEP of February 3, 2010;*

c.    *The District failed to provide appropriate goals in the IEP of February 3, 2010; and*

d.    *The District failed to implement the IEP as offered?*

36.    As established by Legal Conclusions 2, 5, 24, 25 and 26, and Factual Findings 93 through 95, the evidence established that the District did provide meaningful PLOPS at the IEP meeting of February 3, 2010, related to most of the academic goals formulated for Student at that meeting.

44

37.     Legal Conclusions 2, 5, 24, 25 and 26, and Factual Findings 96 and 97, established that academic goals discussed at the IEP meeting of February 3, 2010, met Student's needs as a child with a specific learning disability, and they contained measurable objectives to determine progress.  Therefore, Student was not denied a FAPE because the District did not formulate appropriate goals.

38.     As established by Legal Conclusions 2, 5, 24, 25 and 26, and Factual Findings 69, 73 and 98 through 111, the District failed to offer Student an appropriate program and services for the 2009-2010 school year.  Student was placed in a general education class with services from an IST and instructional aides, but Student was not offered a program that would address his needs resulting from his specific learning disability.  He needed to be placed in a small classroom with a program designed to address his specific learning disability which would include intensive reading instruction for several hours each day. Because the District's offer of program and services did not meet Student's needs that resulted from his specific learning disability, Student was denied educational opportunity, and thus denied a FAPE.

39.     Legal Conclusion 27 and Factual Finding 112, establish that the District did implement the IEP.  However, the evidence also established that the IEP as a whole was inadequate and therefore it did not provide Student with educational opportunity and a FAPE.

*District's Issue 11: Did the District's offer of services and placement in the IEP of February 3, 2010, offer Student a FAPE?*

40.     Legal Conclusions 2, 5, 24, 25 and 26, and Factual Findings 69 and 73, and 98 through 111, establish that the District's offer of services and placement at the IEP meeting of February 3, 2010, did not offer Student a FAPE.  Student required several hours of specialized reading, writing and math instruction, and placement in a small class with students who have similar disabilities.  This was not the District's offer of placement. Instead the District offered to place him in a general education classroom using a reading program for struggling readers.  Although the District believed Student would gain educational benefit from participating in this classroom and reading program, the evidence established that this program was too advanced for Student, even if he received the services of an IST and instructional aides to help him access the program.  He would not have received educational benefit and a FAPE if placed in this classroom.

*Reimbursement*

41.     Parents may be entitled to reimbursement for the costs of services they have procured for their child when: (1) the school district has failed to provide a FAPE and (2) the private placement or services are determined to be proper under the IDEA.  (*School Committee of the Town of Burlington v. Department of Education* (19850 471 U.S. 359; *Student W. v. Puyallup School District* (9th Cir.1994) 31 F.3d 1489, 1496.)  However,

parents are not required to have procured an exact proper placement under the IDEA in order to be entitled to reimbursement. (*Alamo Heights Independent School District v. State Board of Education* (5th Cir.1986) 79 F.2d 1153, 1161.) The parents may receive reimbursement so long as their placement met the student's unique needs and provided the student with educational benefit. (*Ibid.*)

42.    As established by Legal Conclusion 41, and Factual Findings 113 and 114, the District failed to provide Student with a FAPE from March 21, 2007, through February 21, 2010, the date Student filed his complaint. However, no evidence was presented to establish a need for reimbursement, or an amount to be reimbursed. Accordingly, no reimbursement is ordered.

*Compensatory Education*

43.    School districts may be ordered to provide compensatory education or additional services to a pupil who has been denied a free appropriate public education. (*Student W. v. Puyallup School District, supra* 31 F.3d 1489, 1496.) The conduct of both parties must be reviewed and considered to determine whether relief is appropriate. (*Ibid.*) These are equitable remedies that courts may employ to craft "appropriate relief" for a party. An award of compensatory education need not provide a "day-for-day compensation." (*Id.* at p. 1497.) An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.) The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Ibid.*)

44.    As established by Legal Conclusion 44, and Factual Findings 115 through 126, the District did not provide Student with a program designed to meet his needs that resulted from his specific learning disability, and thus Student was denied a FAPE for three consecutive school years. Placement of Student at Stellar Academy for three years, and 600 hours of tutoring to address Student's academic deficits, is appropriate compensatory education, and supported by the record. This placement and the additional services will address Student's need for intensive and explicit instruction and remediation in the areas of reading, writing and mathematics. In addition, the District will provide transportation to this placement. The costs of this compensatory education will be covered by the District through August 15, 2013.

ORDER

1.     The District shall pay tuition and fees for Student to attend Stellar Academy for the next three school years as compensatory education, including summer programs.

2.     The District shall pay for 600 hours of tutoring as compensatory education. The 600 hours shall be used no later than August 15, 2013.

3.     The District shall pay for transportation to and from Stellar Academy, and transportation related to tutoring services.

4.     The District's offer of placement and services at the February 3, 2010 IEP meeting would not provide Student with meaningful educational benefit, and a FAPE.

PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that the hearing decision indicate the extent to which each party has prevailed on each issue heard and decided. Student prevailed on issues 1, 4, 5, 8a, 8b, 8c, 10c, and 11.  The District prevailed on issues 2, 3, 6, 7, 9, 8d, and 10d.

RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction.  If an appeal is made, it must be made within 90 days of receipt of this Decision. A party may also bring a civil action in the United States District Court.  (Ed. Code, § 56505, subd. (k).)

Dated: August 20, 2010

                              /s/
                              REBECCA FREIE
                              Administrative Law Judge
                              Office of Administrative Hearings

47