UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| RAVENSWOOD CITY SCHOOL DISTRICT,<br><br>                    Plaintiff,<br><br>          vs.<br><br>J.S., a minor, et al.,<br><br>                    Defendants. | Case No:  C 10-03950 SBA<br><br>**ORDER** |

Plaintiff Ravenswood City School District ("the District") seeks judicial review of an adverse decision rendered by Administrative Law Judge Rebecca P. Freie ("the ALJ") of the California Office of Administrative Hearings ("OAH") following a twelve-day due process hearing conducted pursuant to the Individual with Disabilities Education Act ("IDEA").  20 U.S.C. § 1415(i)(2)(A).  In particular, the District objects to the ALJ's ruling in favor of the minor student, J.S., which requires the District to pay for his special education at Stellar Academy and for 600 hours of tutoring.

The parties are presently before the court on the District's Motion for Summary Judgment.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the District's motion for summary judgment and AFFIRMS the ALJ's decision.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# I.   BACKGROUND

## A.   OVERVIEW OF THE IDEA

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).  Under Part B of the IDEA, a state must provide disabled children between the ages of three and twenty-one with special education and related services under an Individualized Education Program ("IEP").  20 U.S.C. § 1412(a)(1)(A), (a)(4).  An IEP is a written statement that is developed for each disabled child by an IEP team, typically consisting of the parents, a special education teacher, a representative of the local education agency, an expert, and, sometimes, the child.  20 U.S.C. § 1414(d); Christopher v. Stanislaus Cnty. Office of Educ., 384 F.3d 1205, 1208 n.1 (9th Cir. 2004).

Parents who are dissatisfied with an IEP may file a complaint triggering a meeting with the IEP team "where the parents of the child discuss their complaint" and the educational agency "is provided the opportunity to resolve the complaint …."  20 U.S.C. § 1415(f)(1)(B)(i)(IV).  If the complaint is not resolved "to the satisfaction of the parents within 30 days of the receipt of the complaint," the parents may request a "due process hearing."  20 U.S.C. § 1415(f)(1)(B)(ii).  Following such a hearing, "[a]ny party aggrieved by the findings and decision … shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States."  20 U.S.C. § 1415(i)(2)(A).

## B.   FACTUAL SUMMARY

### 1.   J.S.'s Learning Challenges

Beginning the 2004-2005 school year, J.S. enrolled in kindergarten at the Edison-Brentwood Elementary School ("Brentwood"), a school which lies within the District.  Administrative Decision ("AD") 8.  He has struggled academically and had to repeat the

first grade the following 2006-2007 school year.  AD 9.  J.S.'s mother ("Mother") frequently discussed her son's learning difficulties with his first grade teacher.  Id.

On February 5, 2007, the District convened a Student Success Team meeting ("SST") to address Mother's concerns regarding J.S.'s academic issues.  Id. The District's SST process involved setting up a meeting with J.S.'s parents and school personnel to determine whether "interventions" were needed.  Id.  At the SST meeting, the team decided that Mother was to obtain medical hearing and vision tests for J.S. because he had failed a school nurse's screenings in these areas.  Id.

On March 21, 2007, the SST reconvened, and Mother requested that J.S. be referred for special education assessment.  Id.  The team agreed to her request.  Id. However, the District did not provide Mother with a notice of procedural safeguards at this meeting, as legally required.  Id.  It was the District's practice not to provide this notice at SST meetings, even if the parents requested a special assessment or the team recommended a special assessment.  Id.

The District's method of developing a special education assessment plan for a disabled student involved holding a meeting with the parents, the integrated services teacher ("IST") and specialists who would most likely be assessing the student for special education.  AD 9-10.  Participants in the meeting are referred to as the Initial Assessment Team ("IAT").  AD 10.

Consistent with its practice, the District assembled an IAT meeting which took place on April 4, 2007.  Id.  At the meeting, Mother was incorrectly told that J.S. could not be assessed until she provided the District with the results of the medical vision and hearing tests she had been asked to procure at the February 5 SST meeting.  Id.  As a result, Mother was left with the misimpression that the District could legally refuse to assess J.S. until she provided the test results, and that she lacked grounds to contest such delay.  AD 10-11.

Ultimately, Mother was not provided with an assessment plan until December 17, 2007, almost nine months after she initially requested an assessment on March 21, 2007. AD 13.  The District assessed J.S. for academic achievement in March 2008, but did not

have him assessed by a school psychologist until May 29, 2008 due to the District's lack of school psychologists.  AD 13-15.  The District did not hold an IEP meeting until September 11, 2008, almost eighteen months after Mother's initial request for an assessment.  AD 14.

Ms. Dena Edwy McManis, a psychologist with San Francisco Unified School District ("SFUSD"), conducted J.S.'s May 29 psychological assessment.  AD 15.  Ms. McManis reviewed J.S.'s school records and academic achievement tests, administered various neuropsychological and behavioral assessment tools, and interviewed J.S., Mother, and J.S.'s teacher.  Id.  The assessment showed scores that were consistently at a pre-school or kindergarten level, even though J.S. had attended Brentwood as a regular student for four years.  AD 17.  Ms. McManis reported that J.S. had "significant difficulty retrieving phonological information from long term memory and executing a sequence of operations quickly and repeatedly," and that his struggles "have a direct effect on reading fluency." Id.  She further noted that J.S. had attention issues and concluded that J.S. was cognitively impaired.  AD 15, 17.

### 2.      J.S.'s IEP

The District convened an IEP meeting on September 11, 2008, at which time the IEP team determined that J.S. was eligible for special education services under the category of "specific learning disability." AD 15-16.  The team did not apply the category "mental retardation" because all of the team members who knew J.S. did not believe that he was cognitively impaired.  AD 16.  Mother and J.S.'s father were provided with notices of procedural safeguards and consented to J.S.'s IEP.  AD 16-17.

The IEP included specific performance goals for J.S. based on his Present Levels of Performance ("PLOP").  AD 1.  Mr. Bernard Mojares, an IST at Brentwood, determined J.S.'s PLOPS based on two or more classroom observations of J.S. and an informal screening using the SteDell tool to determine which California grade levels J.S. had met. AD 18.  A student's IEP goals are listed on a standardized form that contains space in which to indicate a student's current baseline performance level where PLOPs may be addressed.  Id.

The baseline information listed on J.S.'s 2008-2009 IEP did not indicate what grade level SteDell tool was used or what the specific tool measured.  Id.  An addendum to the IEP plan addressing J.S.'s math skills understated J.S.'s extremely low academic achievement level established at Ms. McManis's May 2008 assessment.  AD 19.  Additionally, Mr. Mojares created J.S.'s IEP mistakenly believing that J.S. was cognitively impaired; after the IEP team determined that J.S. was not cognitively impaired, Mr. Mojares did not revise J.S.'s IEP.  AD 15-16.  The record shows that an IEP created for a cognitively impaired student is inappropriate for a non-cognitively impaired student. AD 21.

J.S.'s 2008-2009 IEP listed four annual goals.  Id.  First, J.S. was to identify upper and lower case letters of the alphabet, measured by the percentage of letters correctly identified.  Id.  This goal did not set a baseline on how many letters J.S. could identify at the beginning of the school year and did not ask him to identify the sounds associated with each letter.  Id.  The goal also did not directly address J.S.'s lack of phonological awareness.  Id.

J.S.'s second goal was to respond to ask-and-answer questions when a story was read out loud to him, asking and answering an increasing percentage of questions each reporting period.  Id.  This goal did not assist J.S. with learning how to read, and contained no baseline percentage, goal percentage, or criteria for the questions and answers.  Id.

J.S.'s third goal was to determine a "reasonable" phonetic spelling of between 10 to 15 words.  AD 20.  This goal did not contain a baseline indication of which letters and phonemes the student already knew nor which he would be expected to learn, and did not address which words he was to spell.  Id.

Finally, J.S. was to add and subtract numbers up to 10 with 40% accuracy in the first reporting period, numbers up to 15 with 60% accuracy in the second period, and numbers up to 20 with 80% accuracy in the final reporting period.  Id.  This goal did not link his expected performance in each reporting period to his success or failure during the previous term.  Id. The goal did not address J.S.'s baseline math skills.  Id.

### 3.    J.S.'s Progress

For the 2008-2009 school year the District, which characterizes itself as being a "full inclusion" district that does not segregate disabled students, offered J.S. specialized instruction from an IST for 45 minutes, three times a week in group setting.  Id.  In November 2008, due to J.S. making "slight progress," these services were increased to specialized group instruction with an IST for 45 minutes, five times per week and the assistance of an instructional aid for 120 minutes each day.  Id.  Mother disagreed with these placements because the services did not meet J.S.'s unique need to develop phonological awareness. AD 23. Although the school employed "reading specialists," their services were only available to general education students, not to those with an IEP, and J.S. was not offered their services. AD 24.

Throughout the 2008-2009 school year, the District implemented J.S.'s IEP, but the evidence established that J.S. made little progress; J.S. was still unable to consistently recognize letters of the alphabet and their sounds or to add numbers beyond single digits even into the next school year.  AD 24.  As early as the beginning of the 2008 school year, J.S.'s reading deficiency required intensive small-group reading instruction.  AD 23.

On September 9, 2009, Mr. Mojares conducted an informal evaluation of J.S. in advance of J.S.'s forthcoming IEP meeting. AD 28.  On September 11, 2009, J.S.'s IEP team, including Mother and an advocate on her behalf, met for four and a half hours to discuss J.S.'s placement for the upcoming school year.  AD 26.  Mother received a notice of procedural safeguards during this meeting. AD 27.  Although Mr. Mojares had provided the results of his informal assessment two days before, the IEP team had no adequate, formal data to establish J.S.'s current level of performance.  AD 29.  Mr. Mojares's assessment of J.S.'s performance level directly conflicted with J.S.'s teacher's testimony regarding J.S.'s skill levels at the time of this meeting.  Id.

The September 11, 2009 IEP team discussed sending J.S. to one of the other elementary schools in the District, several of which were piloting a new program for struggling readers, called the Inside Program.  AD 26. The team suggested that Mother visit

one or more classrooms using the program.  Id.  The team also discussed the possibility of placing J.S. in a classroom for students with disabilities operated by another school district (the District being full inclusion) or by the county office of education.   AD 26-27.  The team also discussed the possibility of tutoring at Sylvan learning center.  Id. The team did not decide on nor offer a placement at this meeting and did not schedule a time to reconvene, even though the District had an obligation to make a placement offer to J.S. at this point. AD 27.  The District offered to show Mother in-district alternative placements, but did not offer to show her out-of-district placements.  Id.  The evidence suggests that Mother did observe two Inside Program classrooms after this meeting.  Id.  The District offered also offered J.S. IST services for 45 minutes and an instructional aid for 180 minutes. AD 29.

At the September 11, 2009 IEP meeting, Mother had questions regarding J.S.'s academic abilities and the District offered to have Mr. Mojares conduct an educational assessment, but no forms for an assessment plan were available at the IEP meeting.  Id. Mr. Morjares testified that he sent the appropriate forms to Mother's home twice, but that Mother never returned the forms to him.  Id.  The District took no further steps to assess J.S., but did pay Ms. Noll to conduct an independent assessment during November 2009-December 2009.  Id.  The assessment's results were available to Mother prior to J.S.'s next IEP meeting on February 3, 2010.  Id.

At some point between September 11, 2009 and February 3, 2010 J.S.'s IEP plan was modified to include much more explicit details of J.S.'s PLOPs and goals. AD 28.  The modified IEP contained sufficiently detailed and understandable baselines upon which to base J.S.'s goals for the school year.  Id.

At a February 3, 2010 IEP meeting, J.S.'s IEP team reviewed the results of Ms. Noll's assessment as well as a report from a Lindamood Bell Center.  Id.  Mother was given a notice of procedural safeguards. Id.  At the meeting, J.S.'s attorney suggested that J.S. be offered six hours a day of reading instruction at a Lindamood Bell Learning Center.  Id. The team discussed this alternative and also reopened discussion of placing student in a

general education classroom using the Inside Program curriculum.  Id. The IEP team developed goals at this meeting that addressed some of J.S.'s individualized needs and contained measurable objectives.  AD 28.  During this meeting, the District offered J.S. IST services for 45 minutes each day, instructional aide services for 240 minutes per day, and two 30-minutes session with a speech and language therapist in a group setting.  AD 29. These services were fully implemented, with Mother's consent, but did not specifically address J.S.'s need to develop phonological awareness.

At the February 3, 2010 IEP meeting, the District also offered J.S. placement in a general education classroom at the Green Oaks School, an in-district elementary school that was using the Inside Program.  Id.  Mother observed this classroom sometime after the February 9, 2009 IEP meeting.  Id.  Mother agreed to the increased service levels but did not consent to have J.S. placed in the Green Oaks classroom.  Id.  The Inside Program at Green Oaks was too advanced for J.S.  Id.  Mr. Charles Roberson, the teacher of the Green Oaks class using the Inside Program, testified that the program was much less effective for students below a second grade reading level.  AD 30.  At the time of his due process hearing, J.S. was functioning at a kindergarten reading level, and his lack of phonemic awareness was the primary barrier to his advancement in reading.  Id. The Inside Program addresses phonemic awareness only briefly at the beginning of the course, and was insufficient to help J.S. develop his phonemic awareness Id.

J.S. needed reading intensive instruction in a small group setting in a system that is explicit, systematic, and intensive. AD 29.  J.S. required repetition and simultaneous kinesthetic and multisensory instruction.  Id.  Even with the extensive modifications offered by the District and other modifications made by J.S.'s teachers, placement in a general education classroom was inappropriate for J.S.  AD 29.  Placement in Slingerland, Orton Gillingham, and certain Lindamood Bell or other similar programs would best address J.S.'s needs.  AD 31.  The Stellar Academy is one such program.  AD 34.

1

### C.   PROCEDURAL HISTORY

2   On February 28, 2010, J.S. filed a request with the OAH for a due process hearing

3   regarding the District's alleged failure to provide him with a Free and Appropriate

4   Education ("FAPE") since his enrollment in the District.  Compl. ¶ 38.  The District also

5   requested a hearing on whether the placement and services offered in the February 3, 2010

6   IEP constitute a FAPE.  The due process hearing took place before the ALJ on May 17-20,

7   24-27, June 3-4 and 7-9, 2010.  AD 1.

8   On August 20, 2010, the ALJ issued a forty-seven page Administrative Decision,

9   consisting of 126 paragraphs of factual findings and 44 legal conclusions, in which she

10   found that the District had failed to provide J.S. with a FAPE, as required by the IDEA, for

11   the 2007-2008, 2008-2009 and 2009-2010 school years, and that J.S. had suffered

12   academically as a result.  AD 39-45.  Accordingly, the ALJ ordered the District to pay

13   tuition, fees and transportation costs for J.S. to attend Stellar Academy for the next three

14   years as compensatory education, including summer programs.  AD 47.  In addition, she

15   ordered the District to pay for 600 hours of tutoring, also as compensatory education.  Id.

16   On September 2, 2010, the District filed the instant action against J.S., the OAH,

17   Jack O'Connell in his capacity as California State Superintendent of Public Instruction, and

18   the California Department of Education.  Pursuant to the IDEA, the District seeks the

19   review and reversal of the ALJ's Administrative Decision requiring the District to pay for

20   J.S.'s tuition at Stellar Academy and to pay for his tutoring.

21   Shortly after filing its Complaint, the District filed a motion for preliminary

22   injunction to stay enforcement of the Administrative Decision.  J.S. has filed an opposition

23   to the motion and a request for leave to file a cross-motion for a "stay put" order to

24   maintain his placement at Stellar Academy and to otherwise compel the District to comply

25   with the Administrative Decision.  On November 18, 2010, the Court issued an Order

26   denying the District's motion for preliminary injunction and granting J.S.'s motion for a

27   stay put order.  Dkt. 66.

28

1   The District has now filed a motion for summary judgment.  The motion is fully

2   briefed and is ripe for adjudication.

3   **II.    LEGAL STANDARD**

4       Though not a "true motion for summary judgment, the appeal of an IDEA-based due

5   process hearing decision is properly styled and presented by the parties in a summary

6   judgment format."  Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir.

7   1995).  "When a party challenges the outcome of an IDEA due process hearing, the

8   reviewing court receives the administrative record, hears any additional evidence, and

9   'bas[es] its decision on the preponderance of the evidence.'"  R.B. v. Napa Valley Unified

10  Sch. Dist., 496 F.3d 932, 937 (9th Cir. 2007) (quoting 20 U.S.C. § 1415(i)(2)(B)).  Based

11  on this standard, "complete de novo review of the administrative proceeding is

12  inappropriate."   Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 817 (9th Cir. 2007).  The

13  party seeking relief in this Court bears the burden of demonstrating that the ALJ's decision

14  should be reversed.  Clyde K. v. Pullayup Sch. Dist., No. 3, 35 F.3d 1396, 1399 (9th Cir.

15  1994).   In addition, the party challenging the administrative decision bears the burden of

16  persuasion on each claim challenged.  Id.

17      The statutory requirement "that a reviewing court base its decision on the

18  'preponderance of the evidence' is by no means an invitation to the courts to substitute their

19  own notions of sound educational policy for those of the school authorities which they

20  review."  Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).  Rather, "due weight" must be

21  given to the findings in the administrative proceedings.  Id.   The amount of deference to be

22  afforded is a matter of discretion for the court.  See Capistrano, 59 F.3d at 891.  "When

23  exercising its discretion to determine what weight to give the hearing officer's findings,"

24  the court may "examine the thoroughness of those findings" and accord greater deference

25  when they are "'thorough and careful.'"  Id. (quoting Union Sch. Dist. v. Smith, 15 F.3d

26  1519, 1524 (9th Cir. 1994)).  The court "is free to accept or reject the findings [of the ALJ]

27  in part or in whole."  Id. (internal quotations omitted).

28

Under the IDEA, deference is appropriate where an ALJ has carefully and thoroughly attended to the proceedings.  See JG v. Douglas Cnty. Sch. Dist., 552 F.3d 786, 793 (9th Cir. 2008).  The ALJ's written decision as well as the record of the hearing demonstrate that she was highly attentive, diligent and careful.  The ALJ held a twelve-day administrative hearing in which she actively participated and engaged with witnesses and was responsive to the parties' evidentiary concerns.  The ALJ issued a detailed forty-seven page well-reasoned decision that contains 126 factual conclusions and 44 legal conclusions. The opinion discusses the qualifications of the witnesses on whom she chose to rely, and carefully addresses the procedural and substantive issues surrounding whether J.S. received a FAPE.  In addition, her decision was demonstrably balanced, as the ALJ found in favor of the District on numerous issues.  Thus, the Court finds that the ALJ's findings are entitled to substantial deference.

## II.    DISCUSSION

### A.    AUTHORITY TO REIMBURSE J.S.

The District contends, as a threshold matter, that the ALJ had no authority to place J.S. in a non-certified, private school.  See Pl.'s Mot. at 4-5.  However, the ALJ did not order J.S. placed at Stellar Academy.  Rather, she directed the District to reimburse J.S. "*as compensatory education* for the District's failure to provide [him] with a free appropriate education for the 2007-2008, 2008-2009 and 2009-2010 school years.  AR 3543 (emphasis added).  The ALJ's order was within the scope of her authority.  See Forest Grove Sch. Dist. v. T.A., 129 S.Ct. 2484, 2493, 2496 (2009) (holding that parents may send their child to a private program and seek retroactive tuition reimbursement from the state); Michael P. v. Dep't of Educ., 656 F.3d 1057, 1069 (9th Cir. 2011) ("We may award reimbursement for private school placement if a school district unreasonably finds a child with disabilities ineligible for services under IDEA and the private school placement is appropriate.").  This authority extends to reimbursements for private schools that do not meet state standards. Florence Cty. Sch. Dist. v. Carter, 510 U.S 7, 14 (1993) (rejecting contention "that reimbursement is necessarily barred by a private school's failure to meet state education

1    standards."). See Florence Cty. Sch. Dist., 510 U.S at 14 ("'it hardly seems consistent with

2    the Act's goals to forbid parents from educating their child at a school that provides an

3    appropriate education simply because that school lacks the stamp of approval of the same

4    public school system that failed to meet the child's needs in the first place.'"); see also

5    Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH, 642 F.3d 478, 490 (4th Cir. 2011)

6    Thus, the Court rejects the District's contention that the ALJ exceeded her authority in

7    ordering the District to reimburse Mother for J.S.'s tuition at Stellar Academy.

8        **B.    STATUTE OF LIMITATIONS**

9        The statute of limitations for due process complaints in California precludes claims

10   that accrued more than two years prior to the date of filing the request for a due process

11   hearing. Cal. Edu.Code § 56505(l) (A due process hearing "shall be filed within two years

12   from the date the party initiating the request knew or had reason to know of the facts

13   underlying the basis for the request"); 20 U.S.C. § 1415(f)(3)(C) (same). The IDEA, in 20

14   U.S.C. § 1415(f)(3)(D), and California Education Code § 56505, establish exceptions to the

15   statute of limitations if (1) the parent was prevented from filing a request for due process

16   hearing due to specific misrepresentations by the district that it had resolved the underlying

17   problem addressed by the due process complaint, or (2) where the district withheld

18   information from the parent that was required to be provided to the parent.  Here, the ALJ

19   ruled that the limitations period should be extended to claims dating back to March 21,

20   2007 based on the District's failure to provide Mother with the requisite notice of

21   procedural rights at the SST meeting held on that date.  AD 36.  She also found that an

22   extension of the statute of limitations was warranted based on the District's

23   misrepresentation to Mother at the April 4, 2007 meeting that it could not test J.S. until she

24   provided the results of J.S. hearing and vision tests.  AD 10, 36.

25       The District argues that the ALJ erred in applying this exception on the ground that

26   its representation was not erroneous and that it did not otherwise prevent Mother from

27   filing for a due process hearing.  See Pl.'s Mot. at 5-7.  The District's contentions are

28   misplaced.  The law is clear that a parent's failure or refusal to provide the results of

1  external testing does not relieve a school district of its duty to assess a student.  See Union

2  Sch. Dist., 15 F.3d at 1524 (parents' failure to produce a full doctor's report concerning

3  their child did not excuse the school district's failure to assess child and to obtain

4  evaluations for itself).  Notably, the District knew or had reason to know that its statement

5  to Mother was erroneous given the fact that it had previously litigated and lost the same

6  argument; to wit, that it had no duty to provide vision and hearing tests as part of the

7  assessment process.  See Def.'s Opp'n, Ex. E (Ravenswood City School District, 102 LRP

8  3422 (SEHO 200) at 8).  Thus, the District's representation that it could not test J.S. until

9  Mother obtained hearing and vision tests for him was clearly a misstatement.

10         Equally misplaced is the District's assertion that there was no showing that its

11  misrepresentation interfered with Mother's ability to assert her due process rights.  Pl.'s

12  Mot. at 7.  The ALJ determined that the District's misrepresentation misled Mother into

13  believing that she had no grounds upon which to contest the delay and, therefore, denied

14  Mother the opportunity for a due process hearing.  AD 10-11.  As the District has made no

15  showing to the contrary, the Court defers to the ALJ's assessment of the factual issues and

16  Mother's credibility on this point and concludes that the misrepresentation did interfere

17  with Mother's ability to assert her due process hearing rights.  Id.

18         The District next contends that the ALJ erred in extending the limitations period

19  based on its failure to provide Mother with the notice of procedural safeguards at the SST

20  meeting.  Specifically, the District claims that this conclusion was in error because J.S. did

21  not raise this argument in his request for a due process hearing.  Pl.'s Mot. at 7.  However,

22  J.S. specifically preserved this claim in his complaint.  AR 2813-14.  The District waived

23  the right to challenge the specificity of J.S.'s claims when it declined to file a Notice of

24  Insufficiency.  See 20 U.S.C. § 1415(c)(2)(A).  Further, the ALJ held that any pleading

25  deficiencies were harmless and caused by the District's failure to comply with J.S.'s

26  numerous pre-hearing records requests.  AR 669, 2736, 3431.  Given these circumstances,

27  the Court finds that the District has failed to demonstrate that the ALJ erred in extending

28

1  the statute of limitations based on the District's admitted failure to provide Mother with the

2  notice of procedural safeguards as well as its misrepresentation.

3          **C.**     **LEAST RESTRICTIVE ENVIRONMENT**

4         The District argues that the ALJ failed to give due consideration to the requirement

5  that a student's placement must be in the "least restrictive environment" possible.  Pl.'s

6  Mot. at 7-8.  The IDEA requires that school districts offer placements in the "least

7  restrictive environment" available to meet a student's unique needs.  See 20 U.S.C.

8  § 1412(a)(5)(A).  This requirement is commonly referred to as "mainstreaming."  See

9  Sacramento City Unified Sch. Dist. v. Rachel H., 14 F.3d 1398, 1404 (9th Cir. 1994)

10  (adopting multi-factor test to determine appropriate level of "mainstreaming").  A student

11  should thus not be removed from a general education classroom unless the severity of the

12  student's disabilities is such that education in a general education classroom, even with

13  supplementary materials and instructional aides, is insufficient to meet the student's needs.

14  See 20 U.S.C. § 1412(a)(5)(A).

15         According to the District, a private school placement should only be made when a

16  student's disability is such that the student cannot be satisfactorily educated in any public

17  school setting.  Id. at 8.  The District is mixing apples with oranges.  The mainstreaming

18  requirement of the IDEA is to ensure that disabled children are placed "to the maximum

19  extent appropriate ... with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).

20  There is nothing in the record showing that Star Academy is exclusively for disabled

21  students.  As such, the least restrictive environment requirement of the IDEA is not

22  germane to the ALJ's decision.

23          **D.**     **FAPE**

24         The IDEA imposes upon school districts the obligation to provide each student with

25  a FAPE.  Rowley, 458 U.S. at 206-07.  To provide a FAPE, an IEP must meet the student's

26  needs and be reasonably calculated to provide the student with a "meaningful" benefit.

27  Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999).  "A district court shall accord more

28  deference to administrative agency findings that it considers 'thorough and careful.'"  L.M.

1  v. Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (9th Cir. 2009).  Here, the ALJ found

2  that the District failed to provide J.S. with a FAPE for the 2008-2009 and 2009-2010 school

3  years based, inter alia, on the District's refusal to assess J.S. and failure to offer J.S.

4  services that would afford him a meaningful educational benefit.  AD 12-14, 37-46.

5      The District contends that the ALJ's findings and conclusions regarding its failure to

6  provide a FAPE are erroneous.  Pl.'s Mot. at 9-20.  The starting point for addressing the

7  District's argument entails a determination of the level of deference the Court should afford

8  to the ALJ's findings regarding the District's failure to provide a FAPE.  The record shows

9  that the ALJ considered the extensive testimony and evidence presented, and carefully

10  weighed the procedural and substantive issues germane to whether the District provided a

11  FAPE for each school year in question.  In light of the "thorough and careful" consideration

12  of the record in reaching her conclusions, the Court exercises its discretion and finds that

13  the ALJ's findings and conclusions are entitled to deference.  L.M., F.3d at 908.

14          1.    2008-2009

15      With regard to the 2008-2009 school year, the ALJ found that J.S.'s 2008-2009 IEP

16  was inadequate because the plan and its goals were not predicated upon clear baselines or

17  PLOPs.  AD 14-16, 18.  She found that because of the deficient PLOPs, the IEP's goals

18  were not based upon reasoned criteria or J.S.'s current skill levels.  AD 19-20.

19  Additionally, the IEP's goals failed to meet J.S.'s need for phonemic awareness, failed to

20  provide measurable standards for success, and in one instance, failed to use the prior term's

21  achievements to set the next term's goals.  AD 19-20.  Even worse, the IEP was drafted

22  based on the mistaken belief that J.S. was cognitively impaired; yet, even when the IEP

23  team realized that he was not cognitively impaired but instead suffered from specific

24  learning disabilities, J.S.'s plan was not modified.  AD 15.  The ALJ considered testimony

25  regarding the import of PLOPs in determining an IEP plan's goals and proposed services.

26  AD 15.  The ALJ also heard testimony that goals designed for a cognitively-impaired child

27  would not be entirely transferrable to a child lacking such impairment.  AD 20-21.

28

1    The District argues that the lack of baselines is not a violation because baselines are

2   not a mandatory component of an IEP.  Pl.'s Mot. at 19-20.  The Court is not persuaded.

3   "An IEP begins by measuring the student's present level of performance—affectionately

4   known as PLOP—which provides a benchmark for measuring the student's progress

5   toward the goals stated in the IEP."  Settlegoode v. Portland Pub. Schs., 371 F.3d 503, 508

6   n.1 (9th Cir. 2004).  Baseline data must be concise and clearly understandable so that the

7   student's progress can be evaluated.  See O'Toole v. Olathe Unified Sch. Dist., 144 F.3d

8   692, 702-703 (10th Cir. 1998).  The District's contention that the existence of observational

9   and other data obviates the need for baselines is uncompelling.  Mr. Mojares, despite

10   reviewing a variety of reports to draft the goals, could not identify J.S.'s abilities

11   throughout the measurement period. AR 1787.   In addition, as the ALJ found, the

12   purported baselines were wholly insufficient.  For instance, the May 2008

13   psychoeducational evaluation "did not provide any indication of what, if any, skills the

14   Student had in the area of mathematics"; the spelling goal "was too vague to determine

15   what area of need it addressed, the objectives for each reporting period were too vague to

16   be meaningful"; and the reading goals did not address phonemic awareness or "information

17   as to what questions he was expected to ask or answer."  AR 3441-42, 3686-692, 2251.

18   The IPE's goals simply were substantively inadequate.  Accordingly, based on the record

19   presented, the Court finds that the ALJ had a proper basis upon which to find that the

20   District denied J.S. a FAPE for the 2008-2009 school year.

21              **2.      2009-2010**

22        At the IEP meeting held on September 11, 2009, the District offered J.S. the services

23   of an IST for 45 minutes, 5 times per week, and 180 minutes of instructional aid services

24   each day.  AD 29.  On February 3, 2010, the District conducted another IEP meeting at

25   which it offered IST services for 45 minutes each day, 5 days a week, 240 minutes per day

26   of instructional aide services, placement in a general education program using the Inside

27   Program and later added speech and language therapy sessions.  Id.  Mother observed the

28   Inside Program classroom and opted against it, though she agreed to the additional

classroom services.  Id.  The ALJ found that the Inside Program was too advanced for J.S.,
and would not be effective for him.  AD 29-31.  Ultimately, the ALJ concluded that "the
IEP as written and implemented did not meet Student's needs, and provide him with
meaningful education benefit and a FAPE."  AD 31.

The District contends that the Inside Program is effective and points out that during
the due process hearing it presented supporting testimony from several witnesses involved
with the program.  Pl.'s Mot. at 9-15.  What the District fails to acknowledge, however, is
that the ALJ made extensive credibility determinations about the District's witnesses, and
considered their testimony about the Inside Program curriculum in detail.  The District
attempts to argue that it was legal error to rely on J.S.'s witnesses in making findings about
the Inside Program, even though the ALJ determined that J.S.'s witnesses were more
credible than the District's on that issue.  The ALJ discussed in detail her reasons for
according the testimony of Ms. Galloway, Ms. Taber and Ms. Noll great weight.  AR 3446,
3447, 3454.  She also found Mother to be highly credible.  AR 3431, 963, 1272.  In
addition, the ALJ provided an in-depth discussion regarding J.S.'s needs and whether they
would be met by the Inside Program.  Given her thorough and careful consideration of the
testimony and evidence presented, the Court defers to the ALJ's conclusions on this issue.
In sum, based on the record presented, the Court finds that the ALJ had a proper basis upon
which to find that the District denied J.S. a FAPE for the 2009-2010 school year.[1]

## III.   CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED THAT the District's motion for summary judgment is
DENIED, and the Administrative Decision of the ALJ is AFFIRMED.  Judgment shall be

---

[1] The District also asserts that J.S.'s lack of progress was attributable to Mother's
failure to address J.S.'s undiagnosed Attention Deficit Disorder ("ADD") and that the ALJ
failed to take this into account.  Pl.'s Mot. at 20-24.  However, Mother's refusal to have J.S.
tested for ADD does not relieve the District of its duty to assess J.S.'s academic ability,
develop an adequate IEP, and provide a FAPE.  See Union Sch. Dist., 15 F. 3d at 1524.

entered in favor of Defendant J.S.  The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

Dated:  March 30, 2012

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge